# AYERS v. WATSON.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

No. 1356. Argued December 4, 1890. — Decided January 5, 1891.

The allowance of an amendment to' an application for the removal of a cause from a State Court, if allowable at all, is a matter of discretion, to which error cannot be assigned.

When the monuments and other landmarks upon a tract of land in Texas correspond in part with the field notes of the. survey, and in part either do not conform to it or cannot be found, the footsteps of the original surveyor may be traced backward as well as forward, and any ascertained monument in the survey may be adopted as a starting point for its recovery.

A memorandum made by a public surveyor in Texas at the time of the survey, and deposited in the General Land Office at the time when the title was deposited there, is admissible in evidence to aid in proving the actual footsteps of the surveyor when making the survey.

Original field notes of a public surveyor deposited in the General Land Office of Texas are held by the highest court of that State to be competent evidence to identify the granted premises; and this court, if it doubted as to their admissibility for that purpose, would be largely influenced by such decisions.

A writ of error does not lie for granting or refusing a new trial.

In seeking to trace a survey on the ground, the corner called for in the grant as the "beginning" corner does not control more than any other corner equally well ascertained, and it is not necessary to follow the calls of the grant in the order in which they stand in the field notes; but they may be reversed, and should be when by doing it the land embraced would most nearly harmonize all the calls and objects of the grant.

If an insurmountable difficulty is met with in running the lines of a survey of public land in one direction; and all the known calls of the survey are met by running them in the reverse direction, it is only a dictate of common sense to follow the latter course.

When an instruction asked for has been substantially given, with proper qualifications, it is no error to refuse it.

EJECTMENT. The case is stated in the opinion.

*Mr. William E. Earle* for plaintiffs in error.

*Mr. W. Hallett Phillips* for defendant in error.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case has been before us on two former occasions; in October term, 1884, (*Ayers* v. *Watson*, 113 U. S. 594,) and in October term, 1889 (*Ayers* v. *Watson*, 132 U. S. 394). It has had six trials by jury, in three of which the juries disagreed, and in the other three verdicts were found for the plaintiff.

The case comes before us, as heretofore, on a bill of exceptions, and the first assignment of error relates to a matter of a preliminary character. When the cause came on for trial, the defendant below, Ayers, asked leave to file an amendment to his application for the removal of it from the state court, for the purpose of making additional allegations as to the amount in controversy, as to the citizenship of the parties, etc. The court refused to allow such amendment, and the defendant excepted to this ruling. The allowance of such an amendment (if allowable at all) is a matter of discretion, and error cannot be assigned upon the decision. When the cause was here the first time, one of the errors assigned was, that the court below had refused to remand the cause to the state court. We then held that in this refusal there was no error, and we do not see how this question can be further litigated between the parties.

The principal facts of the case, as elicited by the evidence and shown in the bill of exceptions, are stated in the reports above referred to, and only so much will be repeated as is necessary to an understanding of the points now raised.

The plaintiff, Watson, claimed title to one-third of a league of land situated in Bell County, Texas, being a rectangular tract granted by patent of the State of Texas to the heirs of Walter W. Daws, September 16, 1850, the location and boundaries of which are not disputed; and, on the trial, it was agreed by the parties that the plaintiff was entitled to all the right, title and interest granted by said patent. The defendant Ayers, claimed title under a grant of the government of Coahuila and Texas to one Maximo Moreno, dated October 18, 1833, for a tract containing eleven leagues of land;

and it was admitted on the trial that the defendant held and owned all the right, title and interest created by the said grant. This being the older title, the verdict should have been for the defendant if he had shown that the Moreno grant covered the Daws tract owned by the plaintiff; and whether it did or not was the question in controversy in the cause. The Maximo Moreno grant lies on the north side of the river San Andres, with a perpendicular breadth, easterly and westerly, of about seven miles, and extending back into the country, north-northeasterly, about fourteen miles. The Daws tract, owned by the plaintiff, is situated near the north end of the Maximo Moreno grant, about midway between the eastern and western lines of the same, and the question is, whether the north boundary line of the Maximo Moreno grant is situated so far to the north, as to include the plaintiff's land, or whether it runs southwardly of it.

The field notes of the Moreno grant, embodied in the grant itself, are in the Spanish language, and, translated into English, are as follows:

"Situated on the left margin of the river San Andres, below the point where the creek called Lampasas enters said river on its opposite margin, and having the lines, limits, boundaries, and landmarks following, to wit: Beginning the survey at a pecan (nogal) fronting the mouth of the aforesaid creek, which pecan serves as a landmark for the first corner, and from which 14 varas to the north 59° west there is a hackberry 24 in. dia., and 15 varas to the south 34° west there is an elm 12 in. dia.; a line was run to the north 22° east 22,960 varas, and planted a stake in the prairie for the second corner; thence another line was run to the south 70° east, at 8000 varas crossed a branch of the creek called Cow Creek, at 10,600 varas crossed the principal branch of said creek, and at 12,580 varas two small hackberries serve as landmark for the third corner; thence another line was run to the south 20° west, and at 3520 varas crossed the said Cow Creek, and at 26,400 varas to a tree (palo) on the aforesaid margin of the river San Andres, which tree is called in English 'box elder,' from which 7 varas to the

south 28° west there is a cottonwood with two trunks, and 16 varas to the south 11° east there is an elm 15 in. dia.; thence, following up the river by its meanders, to the beginning point, and comprising a plane area of eleven leagues of land or 275 millions of square varas."

The annexed sketch [page 588] shows the outline of the tract, and the relative location and size of the Daws patent owned by the plaintiff:

The beginning corner, A, opposite the mouth of the Lampasas Creek, and the southeast corner, D, at the "box elder," or "double cottonwood," on the bank of the river, are well known and conceded points; and the location of the long easterly line, C' D, is fixed by marked trees, concurred in by both parties; and there is no controversy about the position of the westerly line, A B, the first line of the survey. The difficulty is to locate the back, or northerly, line. The defendant, as owner of the Moreno grant, contends for the line from B to C, which includes the greater part of the plaintiff's tract; and the plaintiff contends for the line from B' to C', which passes south of his land. If either the northwest, or northeast corner were known, the controversy would be at an end; but they are not fixed by any monuments which the parties agree on. The northwest corner, at the end of the first line in the field notes, was a mere stake set in the prairie, and, of course, soon disappeared. The northeast corner, at the end of the second line, was marked by "two small hackberries;" but no such trees have been found at, or near, the point C, where the north line, run by compass and chain according to the survey, would meet the easterly line. In 1854 one Samuel Bigham, a surveyor, under an order of the District Court of Bell County, surveyed the Maximo Moreno grant, commencing at the beginning corner, A, and following the field notes to the end of the second line, and was unable to find the northeast corner, or the easterly line. Some months afterwards he tried again, and by running across the front of the survey, the distance usually taken for an eleven-league front (13,750 varas), he found the eastern line, marked with blazes, which led him to the southeastern corner of the grant (D), when he found

Opinion of the Court.

A.   Beginning corner — well known.
D.   S. E. corner — well known.
B.   N. W. corner, as claimed by defendant.
B'.  N. W. corner, as contended by plaintiff.
C.   N. E. corner as claimed by defendant.
C'.  N. E. corner as contended by plaintiff — 2 hackberries.
C' D.   Marked line, well known, 14 miles long.

and identified the trees called for in the field notes. From this point, following the line back N. 20° E., he found the line plainly marked with old blazes for 26,400 varas, (the length called for in the field notes,) crossing Big Elm or Cow Creek at the exact distance from the S. E. corner required by the field notes; and proceeding onward about 560 varas further, on the same course, he found two small hackberries in Cow Creek bottom, at which point, as he testifies, the line gave out. The line passed between these hackberries, and they were each marked on the inside with old blazes facing each other. He took those hackberries to be the identical ones called for in the grant, and fixed upon that point as the northeast corner of the survey. This is the point which the plaintiff claims to be the true northeast corner, and is marked C′ in the sketch. A line run from this point N. 70° W., the reverse of the line called for in the survey, would be the line B′ C′ on the map, and would fall to the south of the plaintiff's land. But B′, the point at which this line would intersect the west line of the survey, would be only about 18,700 varas from the beginning corner, instead of 22,960 varas, as called for in the field notes, or a deficiency of over 4000 varas.

On the other hand, if the field notes are followed, by running the first line from the S. W. corner, N. 22° E., 22,960 varas, and the second line thence S. 70 E., 12,580 varas, the upper line, B C, would be followed, but the distance, 12,580 varas, would fall short of the eastern line at C by about 570 varas, the true distance from B to C being 13,150 varas instead of 12,580. Then, running from C to D, the whole distance is found to be about 30,400 varas instead of 26,400 (as called for in the grant), or about 4000 too much; and the distance from C to Cow Creek is found to be 7500 or 8000 varas, instead of 3520, as called for in the field notes, or 4000 too much. So that the northeast corner of the tract, as fixed by Bigham at the two hackberries, corresponds very nearly with the several distances called for on the east line, but makes the west line 4000 varas too short; whilst the northeast corner, as fixed by running the west line its full length as called for by the field notes, and then running the north line as directed therein, and

extending it so as to meet the easterly line, makes the easterly line 4000 varas too long.

The truth is, the original survey must in some parts have been imperfectly executed, or errors must have crept into the field notes. Frank W. Johnson was the surveyor — long well known as principal surveyor of the Austin and Williams colony. His deposition was taken in 1878, and again in 1880, forty-five and forty-seven years after the survey was made. He does not say what time of the year he made the survey, but William Duty, his chain-bearer, says it was in the spring. Both say that it was made in 1833, and was never made but once. Johnson is positive that he followed the courses and distances designated in the field notes of the grant for the first two lines, but that the last line, the easterly one of the tract, though run and marked, was not measured, but only estimated as to length or distance. But the field notes give the distance from the N. E. corner to Cow Creek 3520 varas, and from the N. E. corner to the San Andres River 26,400 varas, which would make the distance from Cow Creek to the San Andres 22,880 varas, which, by subsequent surveys, is found to be precisely accurate. This correspondence for such a long distance (over 12 miles) could hardly have been the result of conjecture; and the evidence of the chain-bearer is, that the easterly line, as well as the westerly and northerly lines, was actually measured by chaining. If this was so, (and it was for the jury to determine whether it was or not,) the judge was entirely right in charging that the footsteps of the original surveyor might be traced backward as well as forward; and that any ascertained monument in the survey might be adopted as a starting point for its recovery. This is always true where the whole survey has been actually run and measured, and ascertained monuments are referred to in it. *Ayers* v. *Harris*, 64 Texas, 296; *Ayers* v. *Lancaster*, 64 Texas, 305; *Scott* v. *Pettigrew*, 72 Texas, 321.

On the question of the true location of the northern boundary line of the Moreno grant, evidence was adduced by both parties. The defendant showed by surveyors who had recently gone over the lines that there were old marked trees in the

north line of the survey claimed by him, and that the easterly
line was continued to that line by old marked trees extending
northerly from the two hackberries discovered by Bigham.
The plaintiff, in rebuttal, adduced evidence to show that by
blocking these trees the marks and blazes relied on were found
to be of comparatively recent origin not more than 18 or 20
years old in 1886.

Duty, the chain-bearer, who was examined several times on
the subject, and contradicted himself a good deal, on his last
examination, taken by deposition in 1886, testified that the
two hackberries found by Bigham, and established by him as
the northeast corner, appeared to him (Duty) to be in a loca-
tion like that where the northeast corner was established in
1833, and that the northeast corner, as claimed by the defend-
ant, is in a location entirely different from that in which said
corner was established in the original survey. He also said
that the corner was made, not in the prairie, but in the bottom
timber, and that he does not think that the corner is a hundred
varas from the place claimed by the plaintiff.

The testimony of this witness is not entitled to much weight,
but, being corroborated by the existence of the two hackber-
ries discovered by Bigham, and by the distances from that
point to Cow Creek and to the San Andres River, it may be
regarded as not so entirely worthless as to be absolutely re-
jected. The testimony of several other witnesses, including
surveyors, was taken to show the situation of the different
lines and points named in the grant, and of the condition of
the marked trees claimed by the respective parties to be indic-
ative of the true location.

In addition to the two hackberries, relied on by the plain-
tiff as fixing the position of the N. E. corner and the northerly
line of the Moreno survey, he contended that the respective
distances of the creeks and water-courses, called for by the
field notes on said line, corresponded with the actual distances
found on the line run from said hackberries, and did not cor-
respond with the actual distances found on the line claimed
by the defendant. To show this more clearly, the plaintiff
offered in evidence a certified copy of certain field notes in a

field book on file in the General Land Office of Texas, as the original English field notes of the Moreno survey made by Frank W. Johnson. In his deposition, Johnson had testified that his field notes of the survey were made in English, and reported to the empressario, and by him transcribed and translated into Spanish, and thus carried into the title. C. W. Pressler, chief draughtsman of the General Land Office, testified that these field notes were claimed to have been made by Johnson. DeBray, Spanish clerk in the land office, testified that he had heard Johnson claim that this field book was written by him. There was also a map or sketch of old surveys, including the Moreno survey, bound up in an atlas, regarded as the work of Johnson, and which had been in the General Land Office as far back as the witnesses had knowledge of it. Pressler testified that it was claimed by Johnson to have been filed by him, and that he (Pressler) had known it to have been in the land office since December, 1850, and that the words and figures on it resembled Johnson's handwriting. A certified copy of this map, and the said certified copy of the original field notes of the Moreno eleven-league survey, as also a photographic copy of the latter, were admitted in evidence against the objection of the defendant.

The following is a copy of the field notes referred to:

"Sunday, 21st, surveyed for Samuel Sawyer 11 leagues of land, beginning on the N. side of San Andres, opposite the mouth of Lampasas, at a pecan 18 in. diam., bearing N. 59 W. — vs. from a hackberry 24 in. and S. 34 W. 15.2 vs. from an elm 12 in.; thence N. 22 E. 22,960 vs. to the corner, a stake in the prairie; thence S. 70 E. 1690 vrs. to a branch of Cow Creek, 4500 vrs. to 2nd branch, 8000 vrs. to 3rd branch, 11,060 vrs. to Cow Creek, 12,580 vrs. to the corner, two small hackberries; thence S. 20 W. 3520 vrs. to Cow Creek; 7500 to N. W. corner of 2nd tract, a stake bearing N. 77 E. 93.3 vrs. from a hackberry 8 in. to Spring branch 23,640 vrs., 23,700 vs.; to bottom prairie 24,360 vs.; crossed same branch to the corner, a box elder, 26,400 vs., bearing S. 48 W. 7.2 vs. from a forked cottonwood 48 in., and S. 11 E. 16.4 vrs. from an elm 15 in."

These are evidently the field notes of the same survey that was carried into the grant. It seems that it was made for one Sawyer, and afterwards used for the Moreno grant, which was not issued until October, 1833. Duty, the chain-bearer, says the survey was made in the spring of that year; and the 21st of April came on Sunday in the year 1833. These notes are more full than the field notes in the grant, as they call for four streams crossing the north line, whilst the grant mentions only two of them. The four are as follows: 1690 varas from the N. W. corner to a branch of Cow Creek; 4500 varas to a second branch; 8000 varas to a third branch; 11,060 varas to the Cow Creek itself. The witness Turner, for many years county surveyor of Bell County, who was employed by the defendant to trace the eastern and northern lines of the Moreno grant in 1880, testifies that by running the north line westerly from the two hackberries the first stream is reached at the distance called for in the field notes; that the distance between the first and second is also right; between the second and third the distance is too great; but between the third and fourth, and between the fourth stream and the N. W. corner (as claimed by the plaintiff), the distances agree with the field notes;—whilst the north line, as claimed by the defendant, crosses only three creeks, and none of them are in any way near the distances called for in any of the field notes. As rivers and streams are natural monuments, entitled to weight in any survey, it is manifest that these English field notes of Johnson must have had an important bearing in the trial.

The map or sketch, as before observed, contained an outline of the Moreno eleven-league tract, and of the streams which traverse it, with notes in Spanish of the courses and distances of the different lines. These notes begin with the easterly line, which is described as "Norte · 20° Este, 26,400," [N. 20° E. 26,400]. The north line is partially obliterated, but enough of the notation remains to show that it was measured from east to west. The west line is described as "18,400 Sur 22° Oeste," [*i.e.* 18,400 S. 22° W.]. This shows that the length of the west line was therein made what it should be to correspond with the length of the east line as called for in all the surveys,

and, so far as it goes, is evidence of a survey beginning at the southeast corner and running north, and then west, and then south, the reverse of the course which Johnson says he pursued.   When it is recollected that his testimony was given forty-five years after the survey was made, and that the field notes, which he undoubtedly had regard to, may have been written out in reverse order after the outdoor work was done, the fact that this old map or sketch exhibits a survey entirely consistent in all its parts, which the field notes do not, gives it considerable interest and value as independent evidence.

The admission of the field notes and map is one of the errors assigned on the present hearing; and the question of their admissibility will be now considered.   These very field notes were admitted in evidence in a recent case in Texas, in an action between the appellant Ayers, as plaintiff, and Harris and others, defendants, and their admission was sanctioned by the Supreme Court of Texas on appeal.   *Ayers* v. *Harris*, 77 Texas, 108.   The court, in its opinion, says:

" The evidence, we think, places it beyond doubt that the survey mentioned in the field book as made for Samuel Sawyer was a survey of the same land that was titled to Maximo Moreno, and the only survey that was ever made of it.   It cannot be doubted, upon this evidence, that Johnson having made the survey for Sawyer a few months before, adopted it when ordered to make a survey for Moreno, without making a resurvey.

" The memorandum made by him at the time of the survey and deposited in the General Land Office at the same time that the title itself was deposited there, and carefully preserved ever since, is spoken of by its custodians and produced as an archive.   In the case of *Cook* v. *Dennis*, 61 Texas, 248, a similar document was spoken of by this court as an archive and held to be admissible in evidence.

" Even if it cannot strictly be held an archive of the General Land Office and admissible as such, it was clearly proved in this case to be a memorandum of the survey made by the surveyor at the time the work was done, and as such we think it was clearly admissible to aid in proving the actual footsteps of the surveyor when making the survey.

" Very great difficulty existed in ascertaining where the lines of the survey were actually run. Aided by all the evidence that could be secured, and guided by all the rules recognized as being proper to be observed in such cases, repeated trials of the question have been had with conflicting results.

"It is a well recognized rule that the declarations of the sur-. veyor may be proved under the circumstances existing at the time of the trial of this cause. Such evidence can certainly rank no higher and cannot be so safe or satisfactory as evidence written down by the surveyor at the time. The only difference that we can see between the field notes taken from the field book and those contained in the title is with regard to the number and distances of some of the objects called for, and we think the notes contained in the field book could not have had any other tendency than to aid in showing where the north line of the Moreno survey was actually placed by the surveyor.

"The photographic copy was admissible for what it was worth on the question as to whether the west line of the survey was actually measured.

"The charge requested and refused would have tended to · destroy the effect of the evidence." pp. 114, 115.

By reference to the case of *Cook* v. *Dennis*, (61 Texas, 246,) cited in the above quotation, it seems that similar evidence in all respects was received in that case, and its admission approved by the Supreme Court. The court said :

". . . To aid in the identification of the land, appellant offered to read as evidence a certified copy of the original field notes of the survey. It seems that these field notes were made out in the English language, and passed to the commissioner for extending grants; that they were translated into the Spanish language, and, as thus translated, were incorporated into the grant. The courses and distances along the meanders of the river, as given in the original, were omitted in the translation. Therefore, it was to supply the omission and to aid the grant that the certified copy was offered in evidence. These original field notes were archives in the general land office, and would ordinarily be admissible in aid of the grant.. But the objections urged in this case, and upon

which the court acted in excluding the evidence, were these: The survey was made some five months prior to extending the grants, and was made prior to the order of survey. At that early period, the practice of making the survey, and afterwards obtaining the order of survey, generally prevailed. While such proceedings might not have been strictly regular, such irregularity has never been considered as affecting the validity of the survey or the grant based thereon. The commissioner for extending grants having recognized the survey by extending the grant, it was not a valid objection to the admission of the certified copy that the survey was made before the order of survey, and previous to extending the grant. This rejected evidence would, to some extent at least, tend to establish the identity of the land embraced in the grant, and ought to have been admitted." pp. 247, 248.

It thus appears that these original field notes deposited in the General Land Office, though not forming a part of the documentary title, are nevertheless regarded by the Supreme Court of Texas as competent evidence for the purpose of aiding the grant in regard to the identification and boundaries of the granted premises. Courts have always been liberal in receiving evidence with regard to boundaries which would not be strictly competent in the establishment of other facts. Old surveys, perambulation of boundaries, even reputation, are constantly received on the question of boundaries of large tracts of land. The declarations of surveyors made at the time of making a survey have been admitted; and at all events, it seems to be now a recognized rule of the land law of Texas that field notes of surveyors, especially if deposited in the General Land Office, are to be received as evidence on this subject. If we had any hesitation on the admissibility of such evidence as a general question, we should be largely influenced in the present case by the decisions of the Supreme Court of the State. In our opinion, therefore, the admission of this evidence was not error. In this country a liberal rule on the subject has been adopted in most of the States. The point was considerably discussed by Mr. Justice Lamar in delivering the opinion of the court in *Clement* v. *Packer*, 125 U. S. 309,

a case arising in Pennsylvania, in which, in view of the law prevailing in that State, we held that the declarations of a deceased surveyor, whilst making a survey, were admissible to identify a monument pointed out by him as a corner of the same survey, established in making the original survey many years before, in which he had participated. In *Hunnicutt* v. *Peyton*, a Texas case, 102 U. S. 333, we held that by the decisions of that State such declarations, to be admissible, must be made on the spot whilst running or pointing out the line, or doing something with regard to it, and not at a different place, where it was only spoken of incidentally. Mr. Justice Strong, however, who delivered the opinion in that case, showed that the Texas decisions had gone the length of admitting the evidence of declarations of a deceased surveyor, whilst making a survey of the tract in question, and of a deceased chain-bearer who had pointed out to the witness the place of a corner. See the subject quite fully discussed by Mr. Justice Field, when Chief Justice of California, in *Morton* v. *Folger*, 15 California, 275, 279, 282. But the recent decisions of the Supreme Court of Texas, above cited, are sufficient to control our views in the present case.

The evidence being concluded, the judge delivered his charge, and the jury rendered a verdict for the plaintiff. Before examining the errors assigned in relation to the charge and refusals to charge as requested, the third assignment of error may be disposed of. This was the refusal of the court to grant a new trial. And as to this, we have only to repeat what we have so often endeavored to impress upon counsel, that error does not lie for granting or refusing a new trial.

Although no errors are expressly assigned on argument upon the charge itself, but only upon the refusal of the judge to give certain instructions asked for by the defendant, yet in order to show the general view of the case which was taken by the judge, and the bearing of the instructions asked and refused, we give below the principal portion of the charge actually given. The judge said:

" Our purpose and your duty is to follow the tracks of the surveyor, so far as we can discover them on the ground with

reasonable certainty, and where he cannot be tracked on the ground we have to follow the course and ·distance he gives, so far as not in conflict with the tracks we can find that he made; and you will constantly bear in mind, in considering the proof in this case, that in fixing the boundaries of a grant the rule requires that course shall control distance as given in the calls of the field notes of the survey, and that marked trees, designating a corner or a line on the ground, shall control both course and distance. In order to reconcile or elucidate the calls of a survey in seeking to trace it on the ground the corner called for in the grant as the 'beginning' corner does not control more than any other corner actually well ascertained, nor are we constrained to follow the calls of the grant in the order said calls stand in the field notes there recorded, but are permitted to reverse the calls and trace the lines the other way, and should do so whenever by so doing the land embraced would most nearly harmonize all the calls and the objects of the grant.

"There has been proof given you tending to show where the two small hackberries called for as the intersection of the eastern and north lines of the grant actually stood at a distance from the lower corner on the river corresponding to the length of the eastern line of said grant; and if the proof satisfies you that the two hackberries mentioned in the testimony of the witnesses Sam. and Pat. Bigham were the hackberries called for and marked by the original surveyor as a corner of said grant, in that case a line drawn from the point where said hackberries stood N. 70 W. until it intersects the western line of said grant will bound the eleven-league grant upon the north, and if the Daws one-third of a league is situated wholly north of this line it does not conflict with said eleven-league grant, and you will find for the plaintiff.

"If the proof does not satisfy you that the two hackberries mentioned in the testimony of the witnesses were the two hackberries called for by the original surveyor to serve as a landmark for corner at the intersection of the back (or north) line with the east line of said grant, and if a consideration of the whole proof satisfies you that the original surveyor began

the survey at the ' cottonwood' corner (the S. E. corner) and marked and measured the east line and did not actually trace and measure the west line of said grant, you should follow these footsteps of the surveyor, and from the point where you find his footsteps stop (for it is not disputed that this line is marked to a greater distance than the distance called for in the grant as the length of this line) — from this point where you find the footsteps stop you will run a line N. 70 W. to the west line of said grant for the north or back line; and if this line so run will fall wholly south of the Daws survey you will find for the plaintiff.

" If from the proof you are not able to fix the place where the two hackberries called for in the grant as a landmark to designate the N. E. corner of the Moreno grant then stood, and the proof does not satisfy you that to reverse the calls and trace the lines the other way would most nearly harmonize all the calls with the footprints left by the surveyor, you will fix the boundaries of the Moreno grant by the courses and distances of the first and second lines of the survey, extending the second line so as to meet the recognized east line, extended on its course to the point of intersection with the extended second or north line; and if the north line so fixed will embrace in the Moreno grant any part of the Daws survey, you will find for the defendant."

In our judgment this charge was justified by the testimony in the cause, and, on the whole, gave a correct view of the questions to be solved. The general rules laid down at the commencement are undoubtedly sound. The judge was also correct in saying, as we have already remarked, that the beginning corner does not control more than any other corner actually ascertained, and that we are not constrained to follow the calls of the grant in the order they stand in the field notes, but may reverse them and trace the lines the other way, whenever by so doing the land embraced would more nearly harmonize all the calls and the objects of the grant.

The next paragraph, relating to the two small hackberry trees, and instructing the jury that, if the proof satisfied them that they were the hackberries called for in the original sur-

·vey, the north line must be drawn from them, and the verdict must be for the plaintiff, was undoubtedly correct.

The third paragraph, which directed the jury, if the hackberries were not sufficiently proved, and they were satisfied, from a consideration of all the proof, that the original surveyor began the survey at the S. E. corner and marked and measured the east line, and did not actually trace and measure the west line of the grant, they should trace his footsteps, and where they found them to stop they should run a line N. 70° W. for the north line, was, in our view, also correct. There was some evidence to show that the surveyor did commence the survey at the S. E. corner. The old map or sketch clearly showed this; and the correspondences of distances and other evidence showed that the east line must have been actually measured, contrary to the recollection of Mr. Johnson, the surveyor.

The last paragraph directed the jury, if not able to identify the hackberries as the original corner, and not satisfied that to reverse the calls would more nearly harmonize all the calls with the footprints left by the surveyor, they must follow the courses and distances of the survey, which, of course, would give the land to the defendant. This direction was clearly correct. And taking the whole charge together, it covers the whole case.

The first error assigned in regard to the charge is for the refusal of the judge to give the following instruction, requested by the defendant, to wit:

"If the proof satisfies you that there are old blazes along the east line above the hackberries said to have been found by Bigham in 1854, and that such blazes extend to a distance of 4000 varas to the point of intersection with the course of the north or back line as run from the northwest corner as established by its calls, and that such back or north line is also marked with old blazes, and that these lines were so run and marked by the original surveyor in 1833, then in that case you will find for the defendant."

·· This instruction was substantially given, with proper qualifications, in the first paragraph of the charge, declaring it the

duty of the jury to follow the tracks of the surveyor, so far as discoverable on the ground, with reasonable certainty; and declaring that marked trees, designating a corner or a line on the ground, should control both courses and distances. This gave the defendant the benefit of all he could legitimately ask for in the instruction which he requested; and gave it in a form which better comported with the judge's view of the impression due to the evidence on the subject. A judge is not bound to adopt the categorical language which counsel choose to put into his mouth. Nothing would be more misleading. If the case is fairly put to the jury, it is all that can reasonably be asked. The instruction as requested, if given as an independent proposition, without qualification, was calculated to mislead the jury and draw their attention away from other marks and monuments equally or more controlling. The most controlling evidence of all, if the jury believed it, was that which identified the two hackberries discovered by Bigham as the original trees at the N. E. corner of the tract. Believing that, it ended the controversy. Believing that, the marked trees found farther north in the same easterly line, and the marked trees found in the northerly line, must be considered as having been marked at a later period, as several witnesses who examined them testified. It would not have been fair therefore, to have put forward the instruction asked as a naked independent proposition; for though it be strictly true that if those trees were marked by the original surveyor, they denoted the position of the true line, there were so many considerations affecting the determination of the truth on that point, that an unqualified statement of the proposition as an independent one was not proper. It would have ignored, not only the hackberries, but the Cow Creek bottom, in which there was much evidence to show that the N. E. corner was originally located; and the stream-crossings on the north line itself. Of course, it may be said that all these circumstances would affect the belief of the jury in the identity of the marked trees referred to with those marked by the original surveyor. But the instruction as proposed would have tended to withdraw the minds of the jury from a consideration of this evi-

dence. We think the charge was more correct as the judge delivered it, than it would have been if he had adopted the instruction as proposed by the defendant.

The last paragraph of the charge also gave the defendant the benefit of the lines sought to be established by him, by directing the jury to follow the courses and distances of the survey contained in the grant, if they were not satisfied as to the identity of the two hackberries with those called for in the grant, nor that the original survey was commenced at the S. E. corner. This direction would have led the jury to the identical marked trees referred to in the instruction.

We think there was no error in its refusal.

The fifth assignment of error is for the refusal of the judge to give the following instruction :

" The jury are charged that the field notes which entered into and formed part of the title originally made to Maximo Moreno are those which are to control them in their findings in respect to the work of the surveyor in the field; that they will not consider any field notes of a survey purporting to have been made for Sawyer unless the evidence should show that the field notes last mentioned entered into and were incorporated in the grant made to Moreno, and unless the proof shows that the Sawyer field notes are those which entered into and formed part of the title to Moreno ; otherwise they will disregard the Sawyer field notes, and look only to the field notes in the title issued to Moreno."

We think that the refusal was justifiable. The direction that the field notes in the title should control the jury in their findings would have been too absolute and unqualified. There is no real contradiction between the original field notes found in the General Land Office and the field notes contained in the title. The former are only somewhat fuller than the latter in specifying the water-courses crossed by the survey, some of which were omitted in the title ; and if the jury were satisfied that the field notes produced from the Land Office were genuine, they would have a right to take them into consideration, and not be governed wholly by the field notes in the title.

The sixth assignment of error is for refusing to give the following instruction :

" If the testimony is not sufficient to identify the two hackberries claimed by the plaintiff as the northeast corner of the Maximo Moreno grant with those called for in the grant, and the jury cannot fix the northeast corner nor the back line by any other marks or monuments, then they shall fix it by the courses and distances of the first and second lines of the survey, except that the second line shall be extended so as to meet the recognized east line, as marked and extended beyond the hackberries, and in that case they shall find for the defendant."

This charge was substantially contained in the last paragraph of the charge actually given by the judge, with this qualification, that the jury should not be satisfied that the original survey was commenced at the S. E. corner of the tract. We think that the qualification was correctly made, and that the charge was right, and that in the refusal to give the instruction asked for there was no error.

The seventh assignment relates to the refusal to give the following instruction:

" If the testimony is not sufficient to identify the two hackberries claimed by the plaintiff as the northeast corner of the Maximo Moreno grant with those called for in the grant, and the jury believe from the evidence that the Maximo Moreno survey was actually made on the ground by commencing at the beginning corner as called for in the grant and actually running out and tracing with a chain the upper or western line as called for (except the offset to avoid crossing the river), and that the northwest corner was fixed at a point on the course called for in the grant at the end of the northwest corner so established, the surveyor did actually run out and trace with a chain on the course called for to the northeast corner, they must find for the defendant."

This instruction was also substantially given in the last paragraph of the charge, and is involved in the whole charge taken together. We think there was no occasion for it, and no error in refusing to give it.

The last assignment of error relates to the refusal of the following instruction, to wit:

" It would not be proper to reverse the calls of the grant made to Maximo Moreno and to run in reverse course from the southeast corner for the purpose of ascertaining where the northeast corner would be found by the measurement called for in the grant, if the evidence satisfies the jury that the surveyor actually began the survey at the corner called the beginning corner in the field notes and from that corner ran and measured the western and northern lines on the ground."

We think the instruction was properly refused. . As already intimated, the judge was right in holding as he did, and in instructing the jury, that the beginning corner of a survey does not control more than any other corner actually well ascertained, and that we are not constrained to follow the calls of the grant in the order said calls stand in the field notes, but are permitted to reverse the calls and trace the lines the other way, and should do so whenever by so doing the land embraced would most nearly harmonize all the calls and the objects of the grant. If an insurmountable difficulty is met with in running the lines in one direction, and is entirely obviated by running them in the reverse direction, and all the known calls of the survey are harmonized by the latter course, it is only a dictate of common sense to follow it.

The judgment is                              *Affirmed.*