# Richmond.

## Richmond Cedar Works, Etc. v. H. W. West, et als.

March 21, 1929.

The opinion states the case.

*W. W. Starke* and *W. J. Parrish, Jr.*, for the appellants.

*J. W. Willcox*, for the appellees.

HOLT, J., delivered the opinion of the court.

Designating the parties, plaintiffs and defendants, according to the positions which they held in the trial

court, this is a suit brought by H. W. West and others to enjoin and restrain the defendants from cutting timber on certain land in the Dismal Swamp and to collect damages for that already cut. The relief prayed for was in part given by decree of October 20, 1927. From that decree an appeal has been allowed.

Plaintiffs claim to the eastern line of what is known in the record as the Herron survey, and in addition twenty-two acres adjoining that survey on the southeast. This twenty-two acre tract is part of a sixty-six acre grant from the Commonwealth to A. H. Lindsay, made in 1893. That plaintiffs' holdings, with the exception of this twenty-two acre tract, do extend to the eastern line of the Herron survey, wherever that is, is fairly clear, but its actual location on the ground is the major issue in this controversy. Plaintiffs would shift it to the east and defendants to the west.

The Herron patent itself bears date September 29, 1819, and covers about 4,000 acres of wild land in Dismal Swamp. Roughly speaking, it is a parallelogram, with but one broken line which bounds it on the east. Its point of beginning, which likewise is not questioned, is its northeast corner. If we follow the patent, its line runs with Herron's Ditch westwardly, 257 chains, to the Dismal Swamp Canal, thence southwardly with that canal 164 chains to a stake on its bank, thence eastwardly 200 chains to a gum. From this gum to the point of beginning is the eastwardly boundary of the grant, made up of a number of lines. All of the trees named as landmarks are now gone, with the possible exception of a certain dead white oak.

As is frequently the case where large tracts of wild land are concerned, the survey does not close. To

make it close, one of two things must be done: The 200 chain south line must be extended seventeen chains, or there must be a corresponding extension of the last line of the survey as it is run upon the plat. When either of these things is done, we reach the point of beginning and not otherwise. The plan usually adopted is to follow the lines as they appear on the patent, and to make the necessary changes when the last is reached, rather than make any extension of some intermediate line, but this, as we shall hereafter see, is not possible here as a practical proceeding on the ground.

■ It is an elementary principle in surveying that courses and distances usually give place to recognized monuments and natural landmarks. To illustrate: If this survey were run upon the ground from its point of beginning in a southerly direction, when its south line at the gum had been reached, we would have a call of 200 chains west to the Dismal Swamp Canal. Two hundred chains would not reach that canal by seventeen chains, and its necessary lengthening would be inevitable, not only for the reasons stated, but because its next and westwardly line runs with the canal itself. As a corollary to this rule, those natural landmarks or recognized monuments relied upon must be themselves clearly identified. 9 C. J. 215.

Unless one has the aid of the several maps which are before us, any detailed restatement of the evidence, which in a large measure relates to surveying, would be but a jargon of courses and distances. We shall not undertake it.

■ In order to ascertain and fix upon the ground the lines of a grant, we look first to the grant itself, and follow those lines in the order in which they are there

stated. If it is possible to do this on the ground with certainty, nothing more is to be said. A grantee takes what the State gives unless some senior right has already vested. If this is not possible, resort must be had to evidence *aliunde*.

In the instant case, when we turn north from the 200 chain south line and follow bearings and distances, we find one of these lines described in the patent as running twenty-two degrees east fifty-five chains to a gum in Stewart's line, which is also a line tree in a patent theretofore granted to Hodges and Mills. This line as there described does not come anywhere near the Hodges-Mills grant and leads to an impossible situation. That is to say, you cannot go upon the ground and lay out the Herron land according to the lines of the grant, except in a manner which would be erroneous upon its face. This is admitted in the petition for appeal where it is said: "All parties agree that a call in the grant of 'N. 22 degrees E. 55 chains' is erroneous, and should be read 'N. 22 degrees W. 55 chains'." Hence the necessity for evidence beyond that which the grant gives.

How did this error come about? In the clerk's office of the Circuit Court of Norfolk county is found the surveyor's filed notes on which the patent itself rests. They are a part of the surveyor's record there kept. From them it appears that the lines on the ground were run in an opposite direction from that indicated by the patent; that is to say, the surveyor ran down the east line of the grant and then west to the Dismal Swamp Canal, etc. When copied, courses and distances were reversed, and they were properly reversed in every instance except as to this particular line, so that it alone, of all the lines in the patent, ap-

pear as it was originally written in the field notes. This error is also made manifest by an examination of the plat which is attached to, and is a part of the patent. In the map this line bears twenty-two degrees west as it should.

 It is perfectly true that surveyor's notes are not competent to contradict patents as issued. *Rousens* v. *Lawson*, 91 Va. 226, 21 S. E. 347, a leading and instructive case. The grantee takes what the State gives and nothing more. To hold that he might take 2,000 acres of land when the State had given him only 1,000, because a surveyor's notes give him such an increase, is so manifestly unreasonable as not to merit discussion. Extraneous evidence, however, is competent, not to contradict a patent, but to locate and fix its lines whenever there is any ambiguity on its face. *Elliott* v. *Norton*, 28 Gratt. (69 Va.) 766; *Dogan* v. *Seekright*, 4 H. & M. (14 Va.) 125; *Peery* v. *Elliott*, 101 Va. 709, 44 S. E. 919; *Fentress* v. *Pocahontas Fowling Co.*, 108 Va. 155, 60 S. E. 633; *South & W. R. Co.* v. *Mann*, 108 Va. 557, 62 S. E. 354; *Blacksburg Min. & Mfg. Co.* v. *Bell*, 125 Va. 565, 100 S. E. 806; *Trimmer* v. *Martin*, 141 Va. 252, 126 S. E. 217; *Ayers* v. *Watson*, 137 U. S. 594, 11 S. Ct. 201, 34 L. Ed. 803. Here, not only is the map attached to the patent not in accord with the patent line, but the patent lines, or certainly one of them, is confessedly wrong, and it is in this state of uncertainty that the surveyor's notes become evidence, not only competent but valuable. *Ayers* v. *Watson, supra*. If we follow them as they were run upon the ground, there is no doubt whatever, about the proper location of the eastern boundary. It is certain that this eastern boundary touches the extreme eastern limit of the Hodges-Mills grant. This is not only

shown by the "Cassell Picture Map" in evidence, but it is shown by the map with the patent itself, and there is no doubt about the fact that its location with reference to the point of beginning of the Herron survey is fixed. One grant fixes the other, and if they are shifted, they must be shifted together.

"Calls for adjoining tracts of land are themselves calls for monuments and where they are certain they are monuments of the highest dignity." *Vandell* v. *Casto*, 81 W. Va. 76, 93 S. E. 1044.

It is true that if we follow this last line to the 200 chain south line and follow that line for 200 chains it would fail to reach the canal by seventeen chains, but its extension to that natural boundary would merely be in accord with the common practice of surveyors.

Again, even with the corrections noted in the bearing of the fifty-five chain line, if we undertake to follow this eastern line as it is written into the patent from its southern end, we will find it cannot be done. The calls take us to a point on the Hodges-Mills grant which the plat shows was its eastern end. It then runs around it to a point from which the last line of the Herron grant does to the point of beginning, all of which clearly appears in "Cassell's Picture Map." The line claimed by the defendants does not strike the Hodges-Mills patent at its eastern end, but intersects its southern line some distance west of that point and between this point of intersection and the eastern end of the Hodges-Mills grant, the calls of the Herron patent would have to be ignored.

It is a matter of common knowledge that surveyors reverse courses and readings in order to locate disputed lines. Not only is this a practical check and

rule in the science of surveying, but it stands in law approved by the weight of authority. 9 C. J. 169; *Ayers* v. *Watson*, U. S. 584, 11 S. Ct. 201, 34 L. Ed. 803. This method may be followed without trouble and confirms the plaintiff's claim. If we attempt to apply such reversed readings to the lines relied upon by the defendants, we find it to be impossible, for we must leave the south line of the Hodges-Mills grant at a point several hundred feet west of the eastern extension of these lines as called for in the Herron patent.

Of course, as a surveyor's problem, in this uncharted waste of swamps, it is possible to slip the entire Hodges-Mills patent to the west, but in balancing that possibility, the surveyor's notes, the location of the seventeen acre tract tied to ditches whose identity is established and the manner in which the iron pipe came to be placed as a marker on the line of the Herron survey are all to be remembered and fix its situs with satisfactory certainty.

Much is said about this iron pipe driven into the ground at an angle where it is claimed that the Nash-Miller survey of 1853 joins the Herron land. In the original Herron survey, one of the calls is for a small white oak. Near where it is claimed that this white oak stood is now a dead white oak, and near it is the iron pipe. This pipe cannot be treated as a monument.

"The established rule that the location on the ground of courses and distances designated in the title papers must give way to known or reputed monuments, has reference only to monuments which are designated in the title papers." *Trimmer* v. *Martin*, 141 Va. 252, 126 S. E. 217.

It is, however, as we shall hereafter see, an important bit of evidence.

Nor do we think that the identity of these trees as an independent proposition has been sufficiently established. All that can be said is that they appear to have a common location and the dead white oak and this iron pipe do mark an angle in this Herron line where we would expect to find it when we follow reversed readings, or the surveyor's original field notes.

The Nash-Miller survey cannot be sued as evidence to fix the Herron line as the lines of contemporaneous grants are sometimes used. These surveys were not made by the same parties. They are not contemporaneous nor approximately so, but are thirty-four years apart and are *res inter alios acta*. *Clements* v. *Kyles*, 13 Gratt. (54 Va.) 468; *Overton's Heirs* v. *Davisson*, 1 Gratt. (42 Va.) 211, 42 Am. Dec. 544.

How then is it relevant? In the petition for appeal there is this statement:

"In the evidence, it is shown that a certain point in the swamp is an iron pipe with a board stuck in it. Also that A. H. Lindsay had this pipe set. Now in a grant from the Commonwealth to Richard Nash and Pierce Miller, dated 1854 (which subsequently became owned by A. H. Lindsay), there is a call for 'a dead white oak in West Sylvester's and in the companies line.' There is evidence, which appellants believe is correct, that this iron pipe is at the point of the said call of the Hash-Miller patent. In the grant to A. H. Lindsay in 1894, (both grants shown in the Cassell Picture Map in evidence), there is a call 'to an iron pipe, a corner of the Nash and Miller Land; and the company's land.' We believe that the evidence is correct in stating that this is the same pipe."

We do not think that any principle of estoppel is involved. No subsequent conduct of the plaintiffs

were influenced to their prejudice by the location of this iron pipe. *Hale* v. *Armes*, 137 Va. 167, 119 S. E. 94, 121 S. E. 269.

"Privies, or those who derive title from or through the parties, ordinarily stand in the same position as the parties, and are bound by every estoppel that would have been binding on the parties." Herman on Est., 720.

If this were a suit against A. H. Lindsay, he would not be estopped from showing the true location of the disputed line because he had once made some admission against interest, but that admission could be shown in evidence, and it may likewise be shown in evidence against those who are privy to and claim under him.

A. H. Lindsay had this pipe set on what he thought was the Herron line and he must have been of the same opinion when he applied for and received the sixty-six acre grant in 1894.

As an explanation of his conduct, it is suggested that he had before him only the surveyor's notes in the Herron survey. This may be true but it is guess-work. What he did stands. This pipe pins the Herron line to the dead white oak and the dead white oak is where the small white oak once stood, as is shown by these surveyor's notes.

For another reason we are of opinion that this line is correctly located. On the Cassell Picture Map is a lot of land known as the seventeen and one-half acre tract. That lot was originally granted to W. B. Rogers upon a partition of the A. H. Lindsay estate.

This finding of the trial court, we think, is sustained by the evidence: "The court being satisfied from the evidence that the tract of land and seventeen and one-

half acres conveyed by deed of W. B. Rogers to John West, April 10, 1867, recorded in Deed Book 104, page 436, which was a part of the portion of the Herron land which was assigned to said W. B. Rogers in the partition suit of *Edwards et al.* v. *Lindsay et al.*, in the evidence mentioned, was located at the northeastern corner of said tract of said Rogers, and is now owned by the defendants Lindsay and Ainsworth, and its location is properly shown on the said 'Cassell's Picture Map,' and that the Sykes ditch mentioned in the evidence and shown on that map, is the western boundary of that tract of seventeen and one-half acres, and the ditch shown on said map as 'Blanchard Ditch' is the southern boundary of that tract."

The location of this seventeen acre tract which was a part of that portion of the Herron survey allotted to W. B. Rogers is a matter of importance. It was conveyed by Rogers and wife to John West by deed of date January 12, 1887, and is there described as being on the east side of "Herron's Canal or Ditch," and it is so described in a number of subsequent deeds. This ditch can be none other than that shown on the Cassell map as the Sykes ditch. It runs north and south and there is no other ditch except the Blanchard ditch anywhere in that vicinity. This Blanchard ditch marks the south line of the seventeen acre tract. We think there can be little doubt that it is located east of the Sykes or Herron ditch and where the Cassell map places it. Certainly no other plausible location is suggested.

In 1894, there was granted to A. H. Lindsay by the Commonwealth, a tract of sixty-six acres of land, twenty-two of which lie without the Herron patent, as we have fixed its lines, and the remainder within that grant and of course junior to it. This grant appears

on the Cassell Picture Map at its southeastern corner. The defendants are successors in title to A. H. Lindsay; that is to say, their title goes back to the Commonwealth.

In *Holleran* v. *Meisel*, 91 Va. 143, 21 S. E. 658, this court, in considering a somewhat similar question, said: "By his patent of the 12th of February, 1887, the plaintiff had a *prima facie* title to the land in controversy, with the right of immediate actual possession, and could only be defeated by an adversary possession under color or claim of title for the statutory period, or by showing a previous valid grant by the Commonwealth to the defendant, or to a third person, or a statement of facts from which such patent might be presumed."

No adversary possession has been shown and no grant from the Commonwealth except the grant to Lindsay. Can one be presumed? It may.

"Where there has been long possession under claim of title, and long continued payment of taxes, a patent may sometimes be presumed. In *Archer* v. *Sadler*, 2 H. & M. 370, there had been sixty years of peaceable and uninterrupted possession, together with payment of quit-rents before, and of taxes since, the Revolution, by the caveator and those under whom he claimed; and it was held that it was a case to be submitted to a jury to decide whether a patent should be presumed to have issued formerly, and whether the facts justified such presumption." *Holloran* v. *Meisel*, 87 Va. 398, 13 S. E. 33.

It was presumed in *Matthews* v. *Burton*, 17 Gratt. (58 Va.) 312: Under this state of facts, this land, at the date of the plaintiff's location in 1842, cannot be regarded as waste and unappropriated land, and as

such subject to grant by the Commonwealth. On the contrary, where the possession has continued for such a great length of time, from 1766 to 1842, a legal presumption arises as against the crown and the Commonwealth and claimants under them, that a grant had duly accompanied the first possession, and consequently avoids any subsequent patent. This principle was early settled in this State by the case of *Archer, Admr. of Tanner* v. *Saddler*, 2 Hen. and Mun. 370. It was there settled that a patent or grant for lands, in case of a peaceable and uninterrupted possession of upwards of sixty years, together with the payment of quit-rents or taxes, may be presumed to have formerly issued; but in that case it was held to be the province of the jury, and not of the court, to make that presumption."

In *Archer, Admr.* v. *Saddler, supra,* Judge Tucker spoke of "presumptions, in favor of long and peaceable possession," and Judge Roane, in enumerating the grounds therefor, noted "the improbability that at this time of day, lands in that part of the country (Chesterfield) are vacant."

These cases make it manifest that something more than a paper title is necessary, and it is plain that the reasons which Judge Roane thought were applicable to a well settled county adjoining the State capital do not apply to wild lands in Dismal Swamp.

Plaintiffs trace title to a deed of February 4, 1853, from Alexander Foreman to John West, which antedates the Lindsay grant by about forty years. This deed purports to convey fifty acres of land, more or less, bounded as follows: "On the east by Richd. Nash's Swamp, on the south and east by John Mills' Swamp, on the west by the swamp lands of said West

and on the north by the lands of the heirs of Thos. Hodges and the swamp lands of (now John West and Co.); formerly the lands of Walter Herron or Plume and Co."

It is not easy to identify this fifty acres of land, bounded by four swamps in a land of swamps, or to show that it is the sixty-six acres thereafter patented to Lindsay. But suppose it was. There was no adverse possession, as the trial court properly held. This land was never in the actual possession of anyone and has no value except for the timber there. The probabilities are that no substantial cuttings were made until a comparatively short time preceding the institution of this litigation, and we think it plain that there were none of sufficient magnitude to come within the definition of "peaceable possession" as used in the cases relied upon. At the best they were casual and desultory.

By way of recapitulation, our conclusions are:

The east line of the Herron survey leaves its south line at a point about 217 chains east of the Dismal Swamp Canal. It passes the iron stake at the dead white oak and is tied to Stewart's line and the east end of the Hodges-Mills grant as is shown by the "Cassell Picture Map."

So much of the decree appealed from as gives to the plaintiffs any interest in the twenty-two acres of land which is a part of the 66.56 acre tract patented to Lindsay in 1894 is set aside, it being that part of the Lindsay grant to the southeast of the Herron grant and outside of the lines of the Herron grant as we have fixed them in this opinion. In all other respects the decree appealed from is affirmed.

*Modified and affirmed.*