# Staunton.

## BLACKSBURG MINING AND MANUFACTURING COMPANY V. BELL, ET AL.

### September 17, 1919.

1. DEEDS—*Minerals—Ambiguity in Description—Question for Jury.*
   —A deed conveyed coal and minerals in.and upon a tract of
   land lying "north of Tom's creek and on Brush mountain."
   The base of Brush mountain lies a short distance north of
   Tom's creek. The land between the creek and the mountain
   comprised about 100 acres, and the question arose as to whether
   the descriptive words, "north of Tom's creek and on Brush
   mountain" must be construed as confining the conveyance to
   land *on the mountain,* thereby excluding the 100 acres between
   the creek and the mountain.

   *Held:* That the description in the deed was on its face ambigu-
   ous; that the final question was one of intention as to the
   actual location of the disputed line and fell properly within
   the province of the jury. The question should have been sub-
   mitted to the jury, and a peremptory instruction on either
   side of the question would have been erroneous.

2. DEEDS—*Ambiguity in Description of Subject Matter—Evidence
   Aliunde.*—Evidence *aliunde* is admissible in all cases where
   there is a doubt as to the true location of the survey, or a
   question as to the application of a grant to its proper subject
   matter. It is not a question of construction but of location.
   It is a question of fact to be determined by the jury by the aid
   of extrinsic evidence.

3. EJECTMENT—*Presumptions and Burden of Proof—Location of
   Land.*—In an action of ejectment the burden is on the plaintiff
   to. locate the land claimed by him, and to show that the same
   is within the lines of the title papers upon which he relies.

4. ADVERSE POSSESSION—*Color of Title—Minerals—Actual Posses-
   sion—Case at Bar.*—In the instant case the grantor's succes-
   sors in title who were the defendants claim adverse possession
   in themselves and those under whom they claim for the stat-
   utory period of the minerals upon the disputed land lying be-
   tween the creek and the mountain.

   *Held:* That defendants could not claim any color of title, as they
   either had an absolutely and decisively good paper title or no

paper title at all.  The title which they derived from their pre-
decessor in title, the grantor, either did or did not cover the
land in controversy.  If it did, no question of color of title
or adverse possession arises or can arise; if it did not, they
are solely dependent upon their defense of adverse possession,
they are wholly without color of title under the grantor, and,
having shown none from any other source, they are limited
under that defense to their actual possession of the minerals.

5.  ADVERSE POSSESSION—*Claim of Title—Color of Title—Construc-
tive Possession—Void Writing as Color of Title.*—There can
be no constructive possession of real estate under a mere *claim
of title;* adversary possession to extend beyond the limits of ac-
tual occupancy must be under color of title, and the principal
office of color of title is to define the boundaries.  It is imma-
terial that the title paper relied on as color is defective or
even void as passing title.  It is inherent in color of title that
the claim thereunder is invalid—is in fact no title—and the
writing may indeed be absolutely void.

6.  ADVERSE POSSESSION—*Color of Title—Failure of Description.*—A
failure in description is fatal to any paper as color of title.
A description which contains sufficient terms to designate the
land in question with such certainty that the boundaries there
can be ascertained by the application of general rules govern-
ing the location of land conveyed by any deed, is absolutely
essential.  There can be no color of title to land not described
in the paper relied on as color.

7.  OFFICERS AND AGENTS OF PRIVATE CORPORATIONS—*Declarations and
Admissions—Power of President to Bind Corporation by Ad-
mission—Case at Bar.*—In the absence of proof to the con-
trary, the president of a corporation is not presumed to have
authority to bind the corporation by declarations with respect
to a disputed boundary line.  In the instant case, however, the
evidence showed that the president of the company was in
general charge of its lands, and was actively looking after the
establishment of the boundaries.  Under these circumstances
he must be regarded as the authorized spokesman of the com-
pany, and his declarations in disparagement of its title, like
those of an individual owner, are admissible in evidence.

8.  DECLARATIONS AND ADMISSIONS—*Notice to Lessee not Notice to
Landlord.*—In an action of ejectment involving the question
of a disputed boundary line, a witness was allowed to testify
over the objection of the plaintiff that his father at one time
leased a mine from the plaintiff company and had started to
mine coal when one of the defendants told him that he was
working on his land, and would have to stop, and that the
father of the witness accordingly stopped.  This conversation

did not take place in the presence of any agent or representative of the plaintiff, and did not appear ever to have been communicated to the plaintiff in any way. So far as the record shows, the father of witness was merely a lessee and not an agent of the company; therefore, notice to him was not notice to the company.

*Held:* That the evidence should have been excluded.

9. WITNESSES—*Transactions with Deceased Persons.*—In an action of ejectment involving a disputed boundary line, a witness was allowed, over the objection of the plaintiff, to testify that he had a conversation with the deceased president of plaintiff, in which the latter stated that he and one of the defendants had made a settlement regarding the line in dispute. The statement which the witness attributed to the president might be fairly construed as a statement in conflict with the position of plaintiff, and was, therefore, admissible. Section 3348 of the Code of 1904, invoked by plaintiff, did not render witness incompetent as a witness because he was not a party to the transaction within the meaning of that section.

10. WITNESSES—*Transactions with Deceased Persons—President of Corporation—Disputed Boundary Line—Whether Witness Incompetent for one Purpose is Incompetent for All.*—In an action of ejectment, two distinctly separate subjects of investigation were involved, namely, the question of boundary under the description in a deed, and the claim of adverse possession on the part of the defendants. These were two wholly separate and distinct matters, and neither was merely collateral or incidental to the other. One of the defendants testified in regard to a compromise agreement as to the disputed boundary entered into between the defendant and the deceased president of plaintiff corporation. Plaintiff objected on the ground that the witness was incompetent under section 3348 of the Code of 1904, which objection was sustained. Witness was then permitted to testify over the objection of the plaintiff to the acts of adverse possession of the defendants, the ground of the objection being that the witness having been shown to be incompetent for one purpose could not be permitted to testify as to any fact in the case.

*Held:* That witness might very properly have been held incompetent to testify as to any matter relating to the true location of the disputed line, and at the same time competent as to any matters relating to adverse possession.

11. DOCUMENTARY EVIDENCE—*Boundaries—Notes of Survey.*—Notes of a survey in the handwriting of a deputy county surveyor, which the evidence tended to show was made for the purpose of locating the division line in controversy, in the presence and

under the supervision of the president of the plaintiff and one of the defendants, was admissible in an action of ejectment involving the line.

Error to a judgment of the Circuit Court of Montgomery county in an action of ejectment. Judgment for defendants. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*Hall, Wingfield & Apperson,* for the plaintiff in error.

*Harless & Colhoun,* for the defendant in error.

KELLY, J., delivered the opinion of the court.

This is an action of ejectment in which the plaintiff and the defendants trace title from a common source. The plaintiff, the Blacksburg Mining and Manufacturing Company, claims under a deed from one Jacob Kinser, conveying the coal and minerals in and upon a tract of land lying "north of Toms creek and on Brush mountain." The defendants, Bell and wife, who have succeeded to whatever title remained in Kinser after making the foregoing deed, contend that the plaintiff is claiming the coal and minerals on a part of the Kinser land not embraced in that conveyance.

The base of Brush mountain lies a short distance north of Toms creek. The land between the creek and the mountain, comprising about 100 acres, is the land in dispute. The final and decisive question is whether the descriptive words, "north of Toms creek and on Brush mountain," must be construed as confining the conveyance to lands *on the mountain,* thereby excluding the 100 acres in controversy. The answer to this question depends, as we shall

see, upon a number of considerations, some of which appear in the deed and others of which are shown by extrinsic evidence.

The jury found for the defendants, and to a judgment upon their verdict this writ of error was awarded.

Prior to 1816, Michael Kinser, the father of Jacob Kinser, owned a large boundary of land containing several thousand acres, situate on the waters of Tom's creek, and on which he resided. This land all lay south of the creek, with the exception of about sixty acres on the north, extending in the direction of, but not as far as, the foot of Brush mountain.

By deed dated September 13, 1816, Kinser acquired from Ebenezer Melvin an additional tract of forty-three acres adjoining on the north the boundary already owned by him. This purchase by Kinser covered the intervening territory between his then northern line and the base of the mountain, and gave him about 100 acres north of Tom's creek. The forty-three acres thus acquired by him was a part of a large tract of land owned by Melvin containing in all about 2,500 acres, which was originally embraced in one survey and grant from the Commonwealth to a predecessor in title of Ebenezer Melvin. The greater part of this tract was on Brush mountain. Shortly after the acquisition by Michael Kinser of the forty-three acres above mentioned, Ebenezer Melvin conveyed the residue of the 2,500-acre boundary to Michael Kinser, Christopher Ribble and George Surface, and in a division of the same among the latter it appears that Michael Kinser got 1,500 acres, Christopher Ribble 160 acres, and George Surface 833 acres. The accompanying map shows the exterior lines of the original 2,500-acre tract and the subdivision here mentioned. The controversy in this case, as indicated above, involves the coal and minerals in and upon about 100 acres lying between Tom's creek (not shown on the map), on the south,

72

and the upper line of the forty-three-acre Melvin tract, on the north.

It thus appears that in 1816 Michael Kinser was the owner of a very large estate in land situate on both sides of Tom's creek, and he continued to hold the same until his death in 1826. By his will, which was probated in August, 1826, Michael Kinser disposed of all his real estate, making

the following provisions material to the present controversy:

"Item: I give and bequeath to my beloved wife, Hester Kinser, during her natural life, part of the land whereon I now live, viz: the orchard and pasture lots, being the same comprehended below the cross-fence running from Kipps line near my mill house N. 30 E. poles passing a big white oak between the mill house and the still house, crossing the creek to a swamp Spanish oak below the mill dam; thence

up the creek N. 47 W. — to a black oak near the mill dam; thence up the creek to a hollow leading up back of the barn; thence crossing the mill dam, a northwest course till it strikes *the back line of the big survey, thence with said survey an easterly course to the extent of that survey till it strikes the line or lines of John Robinson's old orchard* to a large white oak in a line between my old tract and the above-mentioned Robinson; thence a south course to a cross-fence, the furtherest from my dwelling-house, and with said fence across the field to a white oak near the fence, between twenty-five and thirty poles leading between my house and John McDonald's, and thence to the beginning. * * *" (Italics added.)

"Item: To my daughter, Katherine, I give * * * four hundred acres of my mountain land, beginning at a white oak in the Miami hollow, and running with Keister Bank and Henry Price, and corners opposite the widow Cromer's old saw mill, and from thence to the back line supposed to contain four hundred acres. * * *"

"Item: To my son, Jacob, I give and bequeath all the landed property which I have devised to my wife for life, being the first bequest in this my last will and testament. * * *"

"Item: I * * * also give and bequeath to my sons, Jacob, George and Christian, about four hundred acres of my mountain tract of land running with the line mentioned in the devise to my son, Jacob, to *the back line of said survey,* and thence down the Miami hollow, and thence to the beginning." (Italics added.)

Thereafter, by partition proceedings or otherwise, Jacob Kinser acquired the interest of his brothers, George and Christian, in the mountain land. Upon the death of his mother, Hester Kinser, he became the owner, *inter alia*, of all the land north of Tom's creek in which she had been given a life estate. The evidence does not make entirely

clear just what were the boundaries of the land north of Tom's creek which Jacob Kinser got in fee and as remainderman, respectively; but it is certain that from both sources he acquired under the will of his father all of the land in controversy in this suit, and quite a good deal in addition thereto, and that he did not acquire any land north of Tom's creek from any other source.

By deed dated February 19, 1853, Jacob Kinser and wife conveyed to George Falconer and William H. Peck "all their right, title, interest and claim in and to all the coal, iron and all other mineral substances lying or being in, upon or under the ground, upon, within or under the boundaries of his the said Kinser's tract of land lying in the county of Montgomery, north of Tom's creek and on Brush mountain, the said survey supposed to contain one thousand acres, upon which there is a coal bank opened, being land formerly owned by his father, the late Michael Kinser."

By deed of April 27, 1853, Falconer and Peck conveyed to the plaintiff, the Blacksburg Mining and Manufacturing Company, the coal and minerals acquired by them under the deed of February 19, 1853, from Jacob Kinser and wife.

Jacob Kinser died without a will, leaving two children, one of them being Sarah E. Bell, wife of William A. Bell, and the other Kizzie Payne, wife of Charles H. Payne. These two children inherited all the real estate owned by their father, and by deed of December 15, 1886, Charles H. and Kizzie Payne conveyed their interest to William A. and Sarah E. Bell, the defendants in the present action.

A number of very interesting questions arise upon the record, and they have been presented both in the oral arguments and in the briefs with the clearness and force characteristic of the distinguished counsel representing the respective sides of the controversy.

The defendants relied upon (1) failure of the plaintiff to show that the Jacob Kinser deed embraced the land in

dispute, and (2) adverse possession in the defendants and those under whom they claim for the statutory period. The assignments of error fall naturally into three general divisions, the first relating exclusively to the plaintiff's claim of title, the second exclusively to the defendants' claim of adverse possession, and the third, in some measure, to both aspects of the case.

1. The plaintiff requested the court to give an instruction designated in the record as instruction 1, which reads as follows:

"The court instructs the jury that the legal effect of the deed of January 19, 1853, from Jacob Kinser and wife to George Falconer and William H. Peck, under which the plaintiff derived title, was to convey to Falconer and Peck the iron, coal and other mineral substances in and under all of the land of the said Jacob Kinser in Montgomery county lying on the north of Tom's creek, which was formerly owned by Jacob Kinser's father, the late Michael Kinser, the survey of said land being supposed to contain one thousand acres, and this is true, regardless of how Jacob Kinser derived title to said land—that is to say, whether he got it under the clause of the will giving a life estate to Hester Kinser with remainder to Jacob Kinser, or whether he got it under the clause of the will making the joint devise to Jacob Kinser and his two brothers, or whether he got it under the clause of the will giving to Jacob Kinser all the balance of the tract not already devised on the south side of the plantation on which Michael Kinser lived."

The court refused to give this instruction as offered, but amended it by substituting for the words, "lying on the north of Tom's creek," the words, "lying on the north of Tom's creek on Brush mountain," thus following the descriptive language of the deed except as to the important omission of the word "and," appearing in the latter. The

instruction as thus amended was given over the objection of the plaintiff, and is known in the record as instruction No. 1a.

We are of opinion that both instructions were wrong. The description in the deed taken on its face is ambiguous, and may plausibly be understood to mean either: (1) all the land, extending northward from Tom's creek and running up on Brush mountain which was owned by Jacob Kinser and acquired by him from his father, or (2) all the land on Brush mountain which was owned by Jacob Kinser and acquired by him from his father.

Many circumstances of more or less significance are relied upon by each party to the controversy to sustain the construction or meaning of the deed as respectively contended for by them. We need not undertake to recount them all. Conspicuous among them on the part of the plaintiff are the following: that the deed referred to a coal bank as having been opened on the land, whereas, according to plaintiff's assertion, no coal bank had been opened north of the northern line of the forty-three-acre tract; that the deed reserves the right to dig and use coal for the grantor and his family, whereas, according to the plaintiff's assertion, the coal outcrop was below the northern boundary of the Melvin tract, and there was practically no coal above that tract; that the deed reserved the right to use the lands for agricultural purposes, whereas none of the land north of the Melvin line was cleared or fit for agricultural purposes, and practically all below that line was in cultivation; that if the land in the dispute is embraced in the deed, the specified area of 1,000 acres will be about covered thereby, whereas a shortage of 100 acres will exist if the land in dispute is not held to be within the description; that Jacob Kinser owned no land north of Tom's creek except what his father owned, and that he owned all of such land, having

acquired the same either by direct devise in fee or as remainderman after his mother's death.

On the other hand, and on behalf of the defendants, some of the considerations relied upon as showing that the description in the deed was not intended to embrace the land between the creek and the mountain are as follows:   That the reference in the deed to *"his, the said Kinser's, tract of land* * * * being land formerly owned by his father, the late Michael Kinser,"* meant the separate tract which he **acquired in fee** under the will of his father, and did not **mean any** part of the adjoining tract which fell to him as **remainderman** after the death of his mother; that he conveyed *one* tract and not *a part of two tracts;* that the true location of the line in dispute was the northern line of the land in which his mother was given a life estate; that such northern line was the northern line of the Melvin forty-three-acre tract, because, as averred by defendants, Michael Kinser considered his lower or farm lands—not his mountain lands—"the big survey," and because it was necessary to treat the northern line of the forty-three-acre tract as "the back line of the big survey" in order to satisfy the description in the will calling for "an easterly course to the extent of that survey until it strikes the line or lines of John Robinson's old orchard;" that the plaintiff has not mined or tried to mine to any extent below and has mined for a number of years above the Melvin tract, which lies at the foot of the mountain, thus showing that it has recognized and acquiesced in the line as now claimed by the defendants.

[1]   Practically all these claims and counter-claims, and others of like general character, rest upon questions of fact, or of opinion and judgment upon facts, affecting the meaning of the language used by the parties in describing the land.  In other words, the final question is one of intention

as to the actual location of the disputed line, and thus falls properly within the province of the jury.

The construction of a deed is for the court, but if the language of the deed will permit more than one inference to be drawn from it, and such inferences depend on controverted facts, the jury is to pass on the deed, and if the construction is dependent upon the meaning of the parties attached to the words. or upon extrinsic facts in connection with the deed, the question is a mixed one of law and fact. If the description is ambiguous, a disputed question of fact as to the grantor's intention, it is one for the jury, and so it is a question of fact if the ambiguity is created by a collateral matter.  *  *  *  It is the duty of the court to construe a deed according to its legal effect in the absence of ambiguity. Where there is ambiguity, however, the question should be submitted to the jury.. The interpretation may in some cases be a mixed question of law and fact." 2 Devlin on Deeds (3d ed.), sec. 835, pp. 1505, 1506.

[2]  "Evidence *aliunde* is admissible in all cases where there is a doubt as to the true location of the survey, or a question as to the application of a grant to its proper subject matter  It is not a question of construction, but of location. It is a question of fact to be determined by the jury by the aid of extrinsic evidence." *Reusens* v. *Lawson,* 91 Va. 226, 235, 21 S. E. 347, 349.

"As a general rule, the construction of all written documents in evidence belongs to the court exclusively, but it is equally well settled that the location of a disputed boundary line is a question of fact for the jury." *Whealton* v. *Doughty,* 116 Va. 566, 574, 82 S. E. 94, 97.

In *Walker* v. *Gateway Milling Co.*, 121 Va. 217, 227, 92 S. E. 826, 829, the same principle was recognized in the following statement:  "The true meaning of the terms of the contract depends upon controverted facts and conflicting evidence, and the question was, therefore, one for the

jury, upon proper instructions, to determine.  *Camp* v. *Wilson*, 97 Va. 265, 270, 33 S. E. 591; *Strause* v. *Richmond, etc., Co.*, 109 Va. 724, 729, 730, 65 S. E. 659, 132 Am. St. Rep. 93."

We agree, therefore, with the contention of counsel for the defendants that the question of the location of the land embraced in the deed was within the province of the jury, and that instruction No. 1, if it had been given, would have improperly taken that question from the jury by peremptorily instructing them that the deed was intended to convey the coal and mineral on all of the Jacob Kinser land lying north of Tom's creek.

But we are further of opinion that the court injected exactly the same error into the amendment.  Instruction No. 1 absolutely disregarded Brush mountain as having any possible significance, and observance of its terms would have compelled the jury to find for the plaintiff.  Instruction No. 1a made it equally imperative upon them to disregard every consideration in the location of the land except Brush mountain, and compliance with it necessitated a verdict for defendants.

The court should have submitted to the jury the question of the true location of the land as described, with an instruction to the general effect that they had the right to take into consideration in determining that question all the facts and circumstances disclosed by the evidence which tended to throw light upon the intention of the parties.

[3]  Instruction 2 for the defendants was as follows: "The court instructs the jury that if they believe from all the evidence that the boundaries of the mineral interest in the land conveyed by the deed under which plaintiff claims are in such doubt and uncertainty that they cannot say whether or not they embrace the land in controversy, they must find for the defendants."

The giving of this instruction is made the ground of one

73

of the assignments of error, and while we do not think it could be made the basis of a reversal, we are of opinion that some slight modification would have presented more clearly the legal proposition involved. The instruction as given is perhaps equivalent to telling the jury that the burden was on the plaintiff to locate the land claimed by it, and to show that the same was within the lines of the title papers upon which it relied. This is the law. 4 Michie's Dig. 904; *Wood* v. *Phillips*, 117 Va. 878, 881, 86 S. E. 101, and cases cited. But it would have been better to instruct the jury more nearly in the language of the proposition as we have here stated it.

With the important and vital exception of the error as to instruction No. 1a, we perceive no substantial errors in the instructions given at the trial in so far as they affect the question of the plaintiff's original title to the land in controversy.

[4] 2. This brings us to the defendants' claim of title by adverse possession. The judgment must be reversed for the error already pointed out, but some of the questions presented under this second branch of the case will probably arise if the case is tried again, and it is proper that we should decide them now. The most important and far-reaching of these questions is involved in the plaintiff's contention that in no view of the case can the defendants claim title by adverse possession beyond the limits of their actual coal openings and mining operations, for the alleged reason that they had no color of title whatever to the coal and minerals. The argument is this: If the line in dispute is, as defendants contend, the northern line of the Melvin forty-three-acre tract, then the plaintiff itself has no shadow of title to the coal and minerals south of that line, and no question of adverse possession arises, for the obvious reason that the defendants themselves have the very title against which the adverse possession would have to oper-

ate; and if, on the other hand, the line in dispute is, as plaintiff contends, at Tom's creek, the defendants, who lay no claim to any paper title by descent cast or otherwise except under Jacob Kinser, from whom they got whatever title they have, are wholly without any color of title. If this argument is sound, then the case in respect to the defense of adverse possession was tried upon an erroneous theory, and practically all of the instructions in regard thereto were wrong.

We are unable to see upon what theory the defendants can claim any color of title in this case. *They either have an absolutely and decisively good paper title or no paper title at all.* Both parties claim under Jacob Kinser, and the sole question, so far as the title papers are concerned, is one of boundary. It is no answer to the argument to say that perhaps the jury found the line as claimed by defendants, and that if so the deed covered the land and would constitute color of title. If the jury did so find there was no room in the case for any color of title or any adverse possession, and no question as to either was involved. The plaintiff must prevail, if at all, purely by reason of the fact that its deed covered the land in dispute. On the other hand, the defendants must prevail, if at all, either (1) because the plaintiff has failed to show title, or (2) because the defendants themselves have shown adverse possession. If they prevail under the former defense, they have shown title by descent to all the land south of the Melvin line. If they fail as to the first and are forced to rely upon the second defense, it is plain that they cannot claim any color of title from Jacob Kinser, simply because in this view of the case his title to the minerals stopped at the Melvin line. To express the idea differently, the title they derived from Kinser either did or did not cover the land in controversy. If it did, no question of color of title or adverse possession arises or can arise; if it did not, they are solely dependent

upon their defense of adverse possession, they are wholly without color of title under Kinser, and having shown none from any other source, they are limited under that defense to their actual possession of the minerals.

[5, 6]    It is well settled that there can be no constructive possession of real estate under a mere *claim of title;* that adversary possession to extend beyond the limits of actual occupancy must be under color of title, and that the principal office of color of title is to define the boundaries. It is immaterial that the title paper relied on as color is defective or even void as passing title. Indeed, as already indicated in what we have said, and as stated in *Baber* v. *Baber,* 121 Va. 740, 755, 94 S. E. 209, 213, "it is inherent in color of title that the claim thereunder is invalid—is in fact no title—and the writing may indeed be absolutely void." This is necessarily true because color of title is only important in cases of claim under adverse possession, and the occasion to invoke adverse possession never arises where the party in possession has the superior paper title. A failure in description, however, is fatal to any paper as color of title. A description "which contains sufficient terms to designate the land in question with such certainty that the boundaries thereof can be ascertained by the application of general rules governing the location of land conveyed by any deed," is absolutely essential. There can be no color of title to land not described in the paper relied on as color. These propositions have been the subject of much consideration and discussion, and are now too well settled to require or warrant further elaboration. See discussion of "Color of Title," by Judge Sims (1896), 2 Va. Law Reg. 551; Graves' Notes on Real Property, sec. 141, and notes; *Stover* v. *Stover,* 60 W. Va. 285, 292, 54 S. E. 350; *Creekmur* v. *Creekmur,* 75 Va. 430, 438; *Chilton* v. *White,* 72 W. Va. 545, 78 S. E. 1048; *Goad* v. *Walker,* 73

W. Va. 431, 80 S. E. 875; 2 Minor on Real Property, sec. 1041 p. 1119, sec. 1042 p. 1122; 1 Cyc. 1089, 1090; 1 Am. & Eng. Enc. L. (2nd ed.) 858, 864, 865.

We are of opinion that the instructions as to adverse possession, in so far as they were based on the theory that the defendants had color of title, were erroneous, and should have been refused.

[7] 3. We come now to the assignments of error based upon the admission of testimony.

The witness, W. F. Wall, was allowed to testify over the objection of the plaintiff, that at one time while he was making a survey of a line some ten miles west of the land involved in this suit, Col. Newlee, then the president of the plaintiff company, said that he did not claim anything south of the Melvin line. It is contended by the plaintiff that this alleged remark of Colonel Newlee related, not to the Melvin land here involved, but to another tract. We do not think this contention is correct, and are of opinion that the reference was to the Melvin line involved in this case. In the absence of proof to the contrary, the president of a corporation is not presumed to have authority to bind it by declarations of this character. The evidence here, however, sufficiently shows that Colonel Newlee, as president of the company, was in general charge of its lands, and was actively looking after the establishment of the boundaries. Under these circumstances he must be regarded as the authorized spokesman of the company, and his declarations in disparagement of its title, like those of an individual owner, are admissible in evidence.

[8] The witness, C. W. Schaeffer, was allowed to testify over the objection of the plaintiff that his father, Solomon Schaeffer, at one time leased a mine from the plaintiff company and had started to mine coal south of the Melvin line when the defendant, Bell, told him that he was working on his (Bell's) land, and would have to stop, and that the

father of the witness accordingly stopped and moved to a point above the Melvin line.   This conversation did not take place in the presence of any agent or representative of the plaintiff, and does not appear ever to have been communicated to the company in any way.   So far as the record shows, Schaeffer was merely a lessee and not an agent of the company.   Notice to him was not notice to the company.   This evidence should have been excluded.

[9]   The witness, H. P. Smith, was allowed over the objection of the plaintiff to testify that he had a conversation with Colonel Newlee, in which the latter stated that he and Bell had made a settlement regarding the line in dispute.   The mention made by this witness of a settlement may perhaps fairly be construed as referring to the running of the line by Surveyor Peck, as testified to by the witnesses, Sibold and Fizer.   In that view, the statement which Smith attributed to Newlee, in which the latter is alleged to have said that the line was settled and he was glad of it, would be a statement in conflict with the position of the company in the instant case, and, therefore, admissible upon the same ground as that upon which we have held that Wall's testimony was properly received.

Section 3348 of the Code, invoked by plaintiff, did not render Smith incompetent as a witness because he was not a party to the transaction within the meaning of that section.

[10]   By far the most important as well as the most interesting question arising with reference to the admission of evidence is that which involved the testimony of the defendant, W. A. Bell.   This witness was offered in an attempt to prove that there had been a compromise agreement entered into between Colonel Newlee and Bell fixing the Melvin line as the southern boundary of the plaintiff's mineral interest in the land.   Since it appeared that Colonel Newlee the agent, who was alleged to have acted for the

plaintiff corporation in this transaction, was dead, the plaintiff objected to his testimony on the ground that he was an incompetent witness under section 3348 of the Code.    That section is as follows:

"And where such contract or transaction was personally and solely made or had with an agent of one of the parties thereto, and such agent is dead or otherwise incapable of testifying, the other party shall not be admitted to testify in his own favor or in favor of a person having an interest adverse to the principal of such agent, unless he be first called to testify on behalf of said principal or some person claiming under him, or the testimony of such agent be first read or given in evidence by his principal or other person claiming under him, or unless the said principal has first testified."

The witness testified to some extent in regard to the alleged compromise agreement with Colonel Newlee, but did so with the understanding that the court was reserving its ruling on the competency of the witness, and the court subsequently took action in regard thereto as indicated by the following statement which was incorporated in the record:

"Now, gentlemen, in regard to the evidence of Mr. Bell and the motion made by counsel for the plaintiff.    I want the record to show that the motion of the plaintiff by counsel was sustained by the court.    Whereupon, the defendant, by his counsel, moved the court to strike out the foregoing evidence of Mr. Bell from the record so far as it pertains to the establishment of the line between the plaintiff company and the defendant, as had with Colonel Newlee, or Dr. Black, both of whom are dead, which motion the court allowed and to which action of the court the plaintiff by counsel excepted, and the court instructed the jury not to regard the evidence of Mr. Bell with reference to the establishment of said line nor to consider any part thereof.

"And the plaintiff by counsel objected to the witness being allowed to testify at all in the case, having been ren-

dered incompetent in the case for one purpose he is incompetent for all, but the court overruled the objection of the plaintiff and permitted the witness to testify over the objection of the plaintiff, to which action of the court the plaintiff excepted."

Thereafter the witness, Bell, was recalled and was permitted to testify over the objection of the plaintiff at some length with regard to the acts of adverse possession of the defendants. The point made against the admissibility of this evidence is that the witness having been shown to be incompetent for one purpose could not be permitted to testify as to any fact in the case. This objection is based upon the authority of *Mason* v. *Wood,* 27 Gratt. (68 Va.) 783; *Grigsby* v. *Simpson,* 28 Gratt. (69 Va.) 348; *Mutual Life Ins. Co.* v. *Oliver,* 95 Va. 485, 28 S. E. 594, and cases of that type.

The question here presented is not free from difficulty. The cases relied upon in support of the objection, or some of them, undoubtedly in terms declare that a witness incompetent for one purpose cannot be permitted to testify to any fact in the case. (See *Ely* v. *Gray,* 125 Va., 100 S. E. 660.) We believe, however, that all of these cases have involved single indivisible contracts or subjects of investigation upon which alone the result of the litigation necessarily depended. In the instant case, from the defendants' standpoint, two distinctly separate subjects of investigation are involved, namely: (1) the question of boundary under the description in the Peck and Falconer deed; (2) the claim of adverse possession on the part of the defendants. There are two wholly separate and distinct matters, and neither is merely collateral or incidental to the other. In this view of the case it seems to us that the witness, Bell, might very properly have been held incompetent to testify as to any matter relating to the true location of the disputed line, and at the same time competent as to any mat-

ters relating to adverse possession. His testimony, however, upon the subject of adverse possession was, as we have seen, put to an improper purpose, because, when viewed in the light of the instructions, it would have tended to establish by adverse possession title to the entire boundary in dispute, when, as a matter of fact, the actual possession by the defendants, as testified to by Bell, affected only a small part of the minerals, and no color of title to the residue was shown. In our opinion it was proper to permit Bell to testify as to the acts of adverse possession which he mentioned in his evidence, but the jury should have been given to understand that in the absence of color of title, the defendants could not hold any part of the land in dispute by adverse possession except such as they had acquired title to by virtue of their mining operations for the statutory period. Of course their possession of the surface does not affect the case, because if the deed from Jacob Kinser to Peck and Falconer covered the land in dispute, that deed effected a severance of the title to the surface from the coal and minerals.

[11] The remaining objection to evidence involves the admission of a paper in the handwriting of a deputy county surveyor, C. D. Peck, marked "survey of the part of the Melvin tract which the coal company is interested in," and containing the notes of a survey which the evidence tends to show was made for the purpose of locating the division line in controversy here in the year 1889, in the presence and under the supervision of Colonel Newlee and Mr. Bell. There was no error in admitting this paper. *Va. Coal & Iron Co.* v. *Ison*, 114 Va. 144, 153, 75 S. E. 782; 5 Cyc. 965-967.

For the reasons indicated in the course of this opinion, the judgment complained of must be reversed and the case remanded for a new trial, to be had not in conflict with the views herein expressed.

*Reversed.*