[No. 32047. *En Banc.* February 10, 1953.]

JOHN E. McCOY et al., *Respondents*, v. BLANCHE A.
LOWRIE  et al.,  *Appellants.*[1]

[1]Reported in 253 P. (2d) 415.

*Therrett Towles* and *L. H. Brown*, for appellants.

*Paine, Lowe & Coffin* and *Trumbull & Ek*, for respondents.

HILL, J.—This is an action to quiet title to mineral rights in one hundred sixty acres of land (NW-¼, Section 15, Township 38 North, Range 42 East, W. M.) in the Metaline mining district in Pend Oreille county, Washington. The trial court found for the plaintiffs and entered judgment accordingly. The defendants appeal.

The defendants are the heirs of Frank C. Allen and Cordelia M. Allen, his wife. Mr. Allen received and recorded a patent from the United States government in 1912, covering the land in question. In 1919, he and Mrs. Allen conveyed the land to the Ione Lumber & Pole Co., a corporation, by a deed (recorded the same year) containing the following reservation:

"The parties of the first part [Frank C. Allen and Cordelia M. Allen, his wife] reserve unto themselves, their heirs and assigns forever all minerals upon or in said lands together with the right to enter thereupon for the purpose of exploring for the same and for the purpose of mining and removing the same."

The Ione Lumber & Pole Co. conveyed the land to John E. McCoy in 1923 by a bargain and sale deed, without reservations or exceptions of any kind. The trial court found that

McCoy had no actual knowledge of the minerals reservation in the deed from the Allens until 1936, when he found that deed while going through some of the old records of the Ione Lumber & Pole Co.

There has never been a request for segregation of the surface and mineral rights in the NW-¼ of Section 15, Township 38 North, Range 42 East, W. M., for taxation purposes; consequently, both prior and subsequent to the deed from Frank C. Allen and his wife to the Ione Lumber & Pole Co., all taxes have been assessed and levied thereon as a unit.

The taxes paid by the McCoys fall into three different chronological divisions. (1) The trial court found that from January 31, 1923, until the year 1932 the taxes were paid "each year before the same became due." (While the finding that the taxes were paid "each year before the same became due" is not challenged, we find no evidence on that point. The tax statements for the years 1923 to 1930 are not in evidence, and McCoy's testimony was only that the taxes were paid for those years. The taxes for 1931, then payable in 1932, were not paid until November 29, 1937.) (2) From 1932 through 1939, the taxes were permitted to become delinquent; the taxes for four years were paid November 29, 1937, and for another four years on September 25, 1939. (3) Beginning with 1940 and continuing through 1951, the taxes were paid each year before they became due.

■ The reservation of the mineral rights in the deed from Frank C. Allen and Cordelia M. Allen constituted a severance of title to the mineral rights and title to the surface. Where there has been such a severance, possession of the surface by the owner is not adverse to the owner of the minerals below it. *Foss v. Central Pac. R. Co.*, 9 Cal. App. (2d) 117, 49 P. (2d) 292 (1935); *Deruy v. Noah*, 199 Okla. 230, 185 P. (2d) 189 (1947); *Calvat v. Juhan*, 119 Colo. 561, 206 P. (2d) 600 (1949); 1 Thompson on Real Property (Perm. ed.) 116, Mines and Minerals, § 92.

■ Where there has been such a severance, title by adverse possession can be acquired to the mineral rights, but all the essential elements of adverse possession must exist

as in the ordinary case of title to real property by adverse possession. The exploration for minerals and mining operations relied upon to establish those essential elements must be open, notorious, continuous and hostile, and under color of title where that is required. *Uphoff v. Trustees of Tufts College*, 351 Ill. 146, 184 N. E. 213, 93 A. L. R. 1224 (1932); *Deruy v. Noah, supra*; see note, "Acquisition of title to mines or minerals by adverse possession," 93 A. L. R. 1232; 1 Thompson on Real Property, *supra.*

The evidence shows that, beginning in 1948, two brothers by the name of Rushmeier, under an agreement with the McCoys, did certain development work on the land here in question and on land in close proximity thereto that might well be sufficient to evidence the beginning of an adverse possession by the McCoys so far as the mineral rights are concerned; but it is unnecessary to decide that point, since that activity has not continued for a sufficient period to enable the McCoys to claim any title to the mineral rights based on adverse possession.

Since the McCoys have acquired no title to the mineral rights by adverse possession, they must perforce rely upon a somewhat unusual statute applicable only to vacant and unoccupied lands enacted in 1893, which requires no element of adverse possession but merely color of title and the payment of taxes for seven successive years, and which, in so far as here material, reads as follows:

"Every person having color of title made in good faith to vacant and unoccupied land, who shall pay all taxes legally assessed thereon for seven successive years, shall be deemed and adjudged to be the legal owner of such vacant and unoccupied land to the extent and according to the purport of his paper title. . . ." RCW 7.28.080; *cf.* Rem. Rev. Stat., § 789.

The findings of the trial court as to the use and occupation of the premises are found in two findings, which we quote verbatim:

"That from January 31, 1923 the plaintiffs [respondents], in good faith, claimed said land and paid all taxes assessed upon said real estate each year before the same became due until the year 1932 and that during said period they en-

tered into possession of said property to the extent that a logging camp was built thereon, and they caused to be removed cedar logs from said property, claiming said property in its entirety; that in the year 1932 the entire property was burned over and the timber thereon substantially destroyed." Finding of fact IV.

"That the real estate in question, except for the cutting of cedar timber, was vacant and unoccupied land. That since about 1935 or 1936 the plaintiffs have from time to time caused cedar timber on the said land to be cut for fence posts, and have, through employees, occupied the said land for said purposes at various periods, from the year 1936 to the present time; that about 1936 one of their employees explored for mineral and found mineral on adjoining land, which was owned by the plaintiffs, and in July of 1943 a party who had purchased cedar timber from the plaintiffs located minerals upon the Northwest Quarter of Section 15 and gave samples of said minerals to the plaintiff John E. McCoy, who forwarded the same to Washington State College for analysis." Finding of fact VI.

The following testimony by John E. McCoy concerning the period prior to the fire in 1931 or 1932 is significant:

"Q. During the period you owned this land, did you occupy it at any time with buildings or with crews or yourself? I am referring to the northwest quarter of 15. A. Yes, we had a camp on there. Q. When did you have the camp? A. Well, it was prior to the fire. It must have been along in— right after the Ione Lumber & Pole Company built it. They built a camp there. Q. The fire you say was in the early 30's? A. 1931."

And in his cross-examination the following question was asked and answer given:

"Q. Speaking of this northwest quarter, you said you had a camp on it. You mean a lumber camp? A. A lumber camp, that is right."

His testimony concerning the use made of the property from 1931 to 1938 was as follows:

"Q. Did any person occupy that land between 1931 and 1948 when the Rushmeiers went on? A. Oh, there was cedar makers in there. Q. Were they living on it or just working on it? A. Working on it. Q. And working for whom? A. Me. Q. How often were they on there? A. Well, during the

summer months they were there quite often. Q. When the cedar makers were not on it, what was its condition with regard to anyone occupying it, living on it or being on it? Was it vacant? A. Yes."

Mr. McCoy testified that the Rushmeiers went on the property in 1948 and erected buildings, put in a shaft, did road work, etc.

■■ Our conclusion, based upon our examination of the record and the trial court's findings, is that the quarter section involved in this case was not vacant and unoccupied land during the periods referred to in the findings; actually, the only period during which this quarter section was vacant and unoccupied, within the intendment of RCW 7.28.080 (cf. Rem. Rev. Stat., § 789), was the few years immediately following the fire which swept over the property in 1931 or 1932, and during that period the taxes were not paid in successive years. We have on several occasions held that payment of taxes "for seven successive years" means payment each year for seven successive years, and that the payment of accumulated delinquent taxes does not meet the requirements of the statute. *Brownstin v. Brelle*, 193 Wash. 553, 76 P. (2d) 613 (1938), and cases there cited.

Our analysis of the facts and the law applicable thereto convinces us that the McCoys have not acquired, by virtue of RCW 7.28.080, any new title to the NW-¼ of Section 15, Township 38 North, Range 42 East, W. M., in so far as the surface rights are concerned, for the following reasons:

■ (a) Because their deed from the Ione Lumber & Pole Co. vested in them the uncontested legal title to the surface rights. An instrument which actually passes title does not provide color of title, as specified in RCW 7.28.080, because the term "color of title," as we have defined it, means "that which is a semblance or appearance of title, but is not title in fact nor in law" (*Bassett v. Spokane*, 98 Wash. 654, 168 Pac. 478 (1917)) and implies that a valid title has not passed. *Crowder v. Doe*, 162 Ala. 151, 50 So. 230, 136 Am. St. 17 (1909); *Baber v. Baber*, 121 Va. 740, 94 S. E. 209 (1917); *Blacksburg Mining & Mfg. Co. v. Bell*, 125 Va. 565, 100 S. E. 806 (1919); *Shutt v. Methodist Episcopal*

*Church*, 187 Ky. 350, 218 S. W. 1020 (1920); *Barnesville v. Stafford*, 161 Ga. 588, 131 S. E. 487, 43 A. L. R. 1045 (1926); *Gooch v. Citizens & Southern Nat. Bank*, 196 Ga. 322, 26 S. E. (2d) 727 (1943); 1 Am. Jur. 894, 898, Adverse Possession, §§ 185, 190; 2 C. J. S. 583, Adverse Possession, § 64.

(b) Because the McCoys did not pay the taxes on the land for any seven successive years, either prior to 1932 or subsequent to 1938, during which the surface was vacant and unoccupied within the purview of the statute relied upon. (The McCoys rely exclusively on the statute cited and claim no rights by adverse possession under RCW 7.28-.070 (*cf.* Rem. Rev. Stat., § 788); hence the case of *Philadelphia Mortgage & Trust Co. v. Palmer*, 32 Wash. 455, 73 Pac. 501 (1903), is of no assistance to them.)

█ Neither have the McCoys acquired, by virtue of RCW 7.28.080, any title to the mineral rights in the NW-¼ of Section 15, Township 38 North, Range 42 East, W.M. Assuming that the form of the deed from the Ione Lumber & Pole Co. to John E. McCoy would provide color of title so for as the mineral rights are concerned because it was in a form which, in the absence of a severance, would have conveyed the mineral rights with the surface rights, and assuming, further, that "vacant and unoccupied land," as used in RCW 7.28.080, also means "vacant and unoccupied mineral rights," the McCoys nevertheless have never paid any taxes on the minerals or mineral rights. They argue to the contrary, insisting that, because they have paid all the taxes levied on the NW-¼ of Section 15, Township 38 North, Range 42 East, W.M., they must have paid the taxes on the minerals, because RCW 84.04.090 (*cf.* Rem. Rev. Stat., § 11108), defining "real property" for taxation purposes, states that it includes "the land itself" and "all substances in and under the same."

This contention is answered in a case decided very recently by the supreme court of Colorado, *i.e.*, *Mitchell v. Espinosa*, 243 P. (2d) (Colo.) 412 (1952). The Colorado taxing statute defining "real property" for taxation purposes and referred to in the opinion is quite similar to

our own, and real property thereunder includes lands, minerals, and quarries in and under the land. The question presented, as stated by the court, was:

"Where a reservation of oil rights is contained in a deed to land which is thereafter assessed for taxes without change or recognition of the severance of the reserved oil interest; where the owner of said reserved oil interest took no action to cause it to be assessed; and where no assessment was made on said severed oil interest; will a tax deed issued for unpaid taxes accruing subsequent to the date of execution and recording of the deed under which the severance of oil interests was effected, convey to the grantee in the treasurer's deed the oil rights theretofore severed and reserved?"

The answer was negative, for the reason that there had never been a valid tax on the reserved oil rights. As the court said:

"Where a separate and distinct estate consisting of 'mines, minerals and quarries in and under' specific land is created by reservation thereof, a sufficient description of this property for assessment purposes requires specific reference to the severed estate. Thus there must be in the assessment a sufficient description of the estate in oil, such as 'all oil and gas beneath and underlying' the specific quarter section of land, or other description of the surface property, before it can be held that severed oil rights have been assessed for the payment of taxes."

The court further said:

"We are satisfied that where oil or mineral rights have been severed from real estate and are owned by persons other than those who hold the surface rights, a failure on the part of the owners to report the mineral rights to the assessor will not supply the essential requirement of an assesssment of those severed rights as a condition precedent to a valid tax deed covering said severed interest in land. In the instant case we are concerned with whether any valid assessment ever was made on the severed oil interest. If no valid assessment was made, no valid tax sale of that property could be had. Identification of the person who was at fault for the lack of a valid assessment is of no importance."

There is also a recent Arkansas decision under a comparable statute. We quote 3 Ark. Stat. 1947 (Anno.), § 37-102:

"Uninproved [unimproved] and uninclosed land shall be deemed and held to be in possession of the person who pays the taxes thereon if he have color of title thereto, but no person shall be entitled to invoke the benefit of this act [section] unless he and those under whom he claims shall have paid such taxes for at least seven [7] years in succession, and not less than three [3] of such payments must be made subsequent to the passage of this act."

While the wording varies somewhat from that of RCW 7.28.080, it will be noted that all that is required to create a new title to unimproved land is color of title and payment of taxes for seven years in succession, which is deemed to be possession. The supreme court of that state, construing the effect of the payment of the taxes where there had been a severance but no segregation of the mineral and surface rights for tax purposes, said:

"The twenty-acre tract was wild and unimproved; and plaintiffs claimed that they had paid taxes on the land for more than seven years, and thereby sought to claim the minerals by limitations under § 37-102, Ark. Stats. Such claim is without avail. This suit does not involve the surface rights of the twenty acres: it involves only the minerals; and the taxes paid by the plaintiffs were the general— or land—taxes. . . . Thus, the plaintiffs' payment of general taxes after 1937 would not constitute adverse possession of the minerals, any more than possession of the surface would have supported a claim of adverse possession against the owner of the minerals. We have repeatedly stated that possession of the surface is not adverse to the owner of the constructively severed minerals." *Buckner v. Wright,* 218 Ark. 448, 236 S. W. (2d) 720 (1951).

See, also, *Jones v. Brown,* 211 Ark. 164, 199 S. W. (2d) 973 (1947); and *Claybrooke v. Barnes,* 180 Ark. 678, 22 S. W. (2d) 390; 67 A. L. R. 1436 (1929), where the court said that, where there has been a severance of the surface and mineral rights,

". . . the minerals underlying a tract of land are not lost by failure to pay taxes thereon unless there is a separate assessment of taxes against them."

We are in accord with the law as laid down in the Colorado and Arkansas cases cited.

The McCoys having at all times since 1923 had the uncontested legal title to the surface rights of the NW-¼ of Section 15, Township 38 North, Range 42 East, W. M., they have, by the payment of the taxes levied on that quarter section, done only what the law requires them to do to protect their own title, and they have gained no new title to either the surface rights or the mineral rights. The Allen heirs must be disseised to lose their right to the minerals, and there has been no disseisin by act or statute except to the extent that H. McKay Allen may have conveyed his interest in the mineral rights by his quitclaim deed of November 30, 1950, as to which we express no opinion.

So much of the judgment appealed from as purports to quiet title in John E. McCoy and Marjorie McCoy, his wife, to the minerals upon or in the NW-¼ of Section 15, Township 38 North, Range 42 East, W. M., against the heirs of Frank C. Allen and Cordelia M. Allen, his wife, and as awards to the McCoys a judgment for costs, is set aside, and the cause is remanded to the superior court with instructions to award such relief to the Allen heirs on their cross-complaint as the facts and the law warrant, including a judgment for costs.

MALLERY, HAMLEY, DONWORTH, FINLEY, WEAVER, and OLSON, JJ., concur.

GRADY, C. J. (dissenting)—I do not agree with the conclusion reached by the majority opinion. Our statutes and administrative rulings when applied to the material facts disclosed by the record justify a holding that respondent acquired title to the reserved mineral rights and their incidents.

In 1912, Frank C. Allen became the owner of the real estate in question by patent from the United States. Sometime thereafter, he moved to the state of Florida and remained there until his death in 1919. Allen conveyed the

land to the Ione Lumber & Pole Co. The deed contained the following reservations:

"The parties of the first part reserve unto themselves, their heirs and assigns forever all minerals upon or in said lands together with the right to enter thereupon for the purpose of exploring for the same and for the purpose of mining and removing the same."

In 1923, the corporation conveyed the land to respondents by a bargain and sale deed without any reservations or exceptions. Respondent McCoy testified at the trial that he had paid the taxes upon the real estate for the years 1923 to 1932. During this period of time, the land was vacant and unoccupied. The court found that such taxes were paid "each year before the same became due." This finding is not challenged and should be accepted by this court. At the time of the making of the conveyance, the land was in its natural state, unimproved, had a growth of timber thereon, and its mineral status was unknown. The property was valued and assessed for taxation purposes as a unit and without regard to its separation into what I shall refer to, for convenience, as the "mineral estate" and the "surface estate." Allen made no request to the taxing authority that there be a segregation of the two estates for taxation purposes.

Our statute, RCW 84.04.090, defines "real property" to be the land itself and all substances in and under the same. The law recognizes the right of an owner of real property to separate it into different estates or interests, so that one may own the minerals with easement rights to carry on mining operations and another may own the remainder, which is usually referred to as the surface and its incidents. When there is such a separation of estates, there may be a segregation thereof and each estate valued and assessed for taxes, or the whole of the real estate may be valued and assessed as a unit. No statute exists requiring taxing authority to make such a segregation.

On September 27, 1928, the attorney general rendered an opinion to the effect that a reserved mineral estate was subject to assessment and taxation as real estate, and that

a county assessor had the legal right to so assess such property. (Opinions, Attorney General, 1927-1928, p. 943.)

On August 5, 1930, the tax commission informed a county assessor that he had the legal right to assess a mineral estate as real estate, and that such had been the action taken in many counties for more than twenty years past pursuant to instructions from the tax commission. Under date of April 21, 1942, the tax commission, by property tax bulletin No. 124, placed its construction upon our statute to the effect that, if an owner of a mineral reservation wishes to protect his interests, he must, in the absence of independent action by the assessor, apply to that official for segregation or notify him that he wishes the reservation specially assessed; that it then becomes the duty of the assessor to so segregate and assess the mineral reservation; but it remains the continuing responsibility of the owner from year to year to see that the reservation is so segregated and assessed.

This court has taken the attitude that opinions of the attorney general and of administrative agencies are not binding upon it, but are entitled to due and proper consideration with reference to questions arising in the performance of their official duties. This is especially true when administrative viewpoint and action has been of long standing and has not been challenged. I think we should now decide that, when Allen reserved the mineral estate, it became his duty to seek its segregation and separate assessment and to pay the taxes so assessed if he desired to escape the effect of RCW 7.28.080; also, that if there be no requested segregation and the assessor makes a unit assessment, it is not limited to the surface estate but covers all taxable estates.

Laws of 1893, chapter 11, p. 20, is an act "to quiet possessions and confirm titles to land." Direction is given that the act shall be liberally construed for the purposes set forth therein. Sections 3 and 4 of the act are codified in RCW 7.28.070 and 7.28.080. The latter section of the act, if applicable to the reserved mineral estate, seems to me to solve the problem presented. It provides as follows:

"Every person having color of title made in good faith to vacant and unoccupied land, who shall pay all taxes legally assessed thereon for seven successive years, shall be deemed and adjudged to be the legal owner of such vacant and unoccupied land to the extent and according to the purport of his paper title. All persons holding under such taxpayer, by purchase, devise, or descent, before the seven years have expired, and who continue to pay the taxes as aforesaid, so as to complete the payment of the taxes for the term aforesaid, shall be entitled to the benefit of this section: *Provided*, That if any person having a better paper title to such vacant and unoccupied land, during such term of seven years, pays the taxes as assessed on the land for any one or more years of such term, then and in that case such taxpayer, his heirs or assigns, shall not be entitled to the benefit of this section."

It is my view that, when a mineral estate is reserved from a grant of real estate, it may become "vacant and unoccupied land" within the meaning of RCW 7.28.080; that color of title thereto may be acquired in good faith; and if, in the absence of requested segregation, taxing authority assesses taxes upon all of the estates as a unit in the name of and to one holding a deed thereto without any reservations or exceptions and such person pays the taxes for seven successive years, he becomes the owner of the mineral estate.

It seems to me that when Laws of 1893, chapter 11, was enacted, the legislature sought to provide a method of stabilizing titles to real estate and also to aid in the collection and payment of taxes. The owner of real estate was advised that he would lose title thereto if he did not pay the taxes levied against it. One who in good faith acquired color of title to the land and paid such taxes for seven successive years, was advised that he would be deemed and adjudged to be the legal owner thereof to the extent and according to the purport of his paper title. A public policy aspect is voiced throughout the whole enactment. Giving the act a liberal construction, I find no difficulty in concluding that the deed from the Ione Lumber & Pole Co. to McCoy "purported" to convey to him the entire tract of land described therein, and that such "paper title" constituted "color of

title" contemplated by the act. We should give the words "color of title" and "purport of his paper title" the meaning and application necessary and proper to carry out the purpose set forth in the act, rather than to apply definitions of the words found in cases not involving the somewhat unusual situation here presented.

It seems likewise clear that, although a reserved mineral estate is such an unknown and intangible estate as to be incapable of physical occupancy or possession until mining operations take place, nevertheless, there may be a constructive occupancy thereof by the payment of taxes thereon so as to prevent the operation of RCW 7.28.080. But when a grantor reserves a mineral estate, abandons it, never makes any search for minerals or does any act indicating any intention other than to keep the title to the land clouded, has no segregation made for taxing purposes, and neither pays nor offers to share in the payment of the taxes, it should be held that the mineral estate was vacant and unoccupied within the meaning of the act. This disposal of the case makes it unnecessary to determine the other questions raised with reference to the application of RCW 7.28.070.

The judgment should be affirmed.

SCHWELLENBACH, J. (dissenting)—Although the deed from the Allens to the Ione Lumber & Pole Co. contained a reservation of the mineral rights, the deed from the Ione Company to the McCoys contained no such reservation. The McCoys paid taxes in good faith for more than seven successive years on the entire tract, which included the land itself and all substances in and under the same.

The logging operations were of such minor proportions that they did not rise to the dignity of changing the status of the land from that of unoccupied land.

The judgment should be affirmed.

———

May 7, 1953. Petition for rehearing denied.